**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **KENNETH A. BARTON, et al.,** | : | **Civil Action No.: 10-3657 (PGS)** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **MEMORANDUM OPINION** |
| | : | **AND ORDER** |
| **RCI, LLC,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**ARPERT, U.S.M.J.**

I.      **INTRODUCTION**

On July 20, 2010, Plaintiffs filed a Complaint against RCI, LLC ("Defendant" or "RCI")

alleging "violation of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8-1, *et seq*. ("NJCFA")",

"breach of [the] implied covenant of good faith and fair dealing", "breach of contract" and

"violation of the Plain Language Act", and seeking declaratory and injunctive relief in addition

to compensatory and punitive damages related to Defendant's "Points Program".   *See* Pl.'s

Compl., dkt. entry no. 1 at 1-33.   Plaintiffs maintain that Defendant's core business is "vacation

exchanges" that "offers its members both week-for-week vacation exchange opportunities and

customized vacation experiences through its...exchange networks".  *Id*. at 3.  Plaintiffs claim that

"[Defendant] boasts of a large affiliate network of resorts world-wide" which includes "the Blue

Bay family of resorts ("Blue Bay")" and that "[Defendant]...provide[s]...services and support in

helping resorts develop business plans to attract new owners and to sell more vacation ownership

by marketing the exchange programs...[that] [Defendant] offers".  *Id*. at 3-4.  Thus, "[i]nstead of

exchanging one fixed week for another fixed week", members of Defendant's "Points Program"

can "choose where to stay, how many days to stay, rent a car during the stay, and obtain airline tickets to get to the destination of choice...all by using points".  *Id.*

In sum, Plaintiffs maintain that "[t]hrough marketing presentations, printed materials, and written contracts that were uniform in all material respects, [Defendant] sold memberships into [its] Points Program to each Plaintiff and putative class member in conjunction with each putative class member's purchase of an interval of vacation time at a Blue Bay resort" and that "[a]t all relevant times, Blue Bay acted for [Defendant] with actual authority and apparent authority".  *Id.* at 4-5.  "[Defendant's] vacation exchange pitch, communicated by on-site affiliate staff and supported by RCI-generated point-of-sale printed materials, was...that...[a] person could purchase as many one night stays at a Blue Bay resort as desired for a low, one time cost and use the collective point value of those one night stays to customize future vacations through [Defendant's] Points Program, including accessing [Defendant's] Points Partners Inventory (airline tickets, rental cars, and the like)".  *Id.* at 5.  Plaintiffs claim that "[Defendant's] printed materials highlighted the ability to exchange points for worldwide destinations and listed international and domestic airlines...as readily accessible means for traveling to the desired destinations through exchanging points" and, further, that "[t]he ability to exchange points for international and domestic airfare was a particularly attractive aspect of the pitch because the upfront and total cost of acquiring plenty of points to acquire airfare over many years was less than the out-of-pocket costs one would have to pay on the open market for such airline tickets".  *Id.* at 5-6.  Collectively, the nine named Plaintiffs claim to have purchased 65,700,934 RCI points.  *Id.* at 15.

At first, Defendant's "Points Program generally lived up to the expectations set by

[Defendant's] sales pitch" as "Plaintiffs were able to exchange points for otherwise expensive international and domestic air travel and design their desired vacations by using RCI Points Partner Inventory". *Id*. at 15-16. However, in June, July and August 2008, "[Defendant] began denying Plaintiffs' point exchanges for Partner Inventory". *Id*. "In September 2008, [Defendant] mailed to each Points Program member who joined through...Blue Bay...prior to February 29, 2008 a letter notifying them that [Defendant] was unilaterally imposing a 60,000 annual point limit cap on Points Partner Inventory redemptions" in order to "preserve the integrity of the RCI network". *Id*. at 17. Plaintiffs maintain that "[t]he cap equates to essentially one domestic – one way – airline flight", that it is "grossly insufficient to ever obtain the type of international and domestic airfare [Defendant] promoted in its written materials and by its affiliated sales associates", and that it was actually imposed "to economically benefit [Defendant] to the detriment of those Points Program members who joined through Blue Bay". *Id*. Plaintiffs contend that if the "printed materials and the sales pitch...indicated a 60,000 annual cap on redemptions for Points Inventory, a reasonable person either would not have joined the RCI Points Program...or would not have purchased as many points as were often purchased". *Id*. Based in part on the assertion that "[n]othing in the [t]erms and [c]onditions of RCI['s] Points Network Membership...states, implies or reflects the possibility of a cap on the amount of points redeemed in any given year", Plaintiffs maintain that "[Defendant's] unilateral restructuring of the bargain did and does harm...[them] and putative class members". *Id*. at 20-21.

This matter now comes before the Court on two (2) discovery motions. Specifically, Plaintiffs filed a motion to compel Defendant to provide supplemental answers to certain Interrogatories  and to produce supplemental documents and information in response to certain

3

Requests for Production ("RFP") [dkt. entry no. 49].  Defendant has opposed Plaintiffs' motion.

*See* dkt. entry no. 55.   Separately, Defendant filed a motion to compel Plaintiffs to produce

certain documents that they have withheld [dkt. entry no. 50].   Plaintiffs have opposed

Defendant's motion.  *See* dkt. entry no. 56.   For the reasons stated on the record and herein, the

Parties' Motions are **GRANTED**, in part, and **DENIED,** in part, as set forth below.

## II.     LEGAL STANDARDS

### (A)     Discovery

Pursuant to FED. R. CIV. P. 26(b)(1), "parties may obtain discovery regarding any

nonprivileged matter that is relevant to any party's claim or defense" and "the court may order

discovery of any matter relevant to the subject matter involved in the action", although "relevant

information need not be admissible at trial if the discovery appears reasonably calculated to lead

to the discovery of admissible evidence".  *See also Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir.

2000).  Importantly, pursuant to FED. R. CIV. P. 26(b)(2)(C), "the court must limit the frequency

or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

> (i)     the discovery sought is unreasonably cumulative or
> duplicative, or can be obtained from some other source that
> is more convenient, less burdensome, or less expensive;

> (ii)    the party seeking discovery has had ample opportunity to
> obtain the information by discovery in the action; or

> (iii)   the burden or expense of the proposed discovery outweighs
> its likely benefit, considering the needs of the case, the
> amount in controversy, the parties' resources, the
> importance of the issues at stake in the action, and the
> importance of the discovery in resolving the issues.

Further, "the Court has a responsibility to protect privacy and confidentiality interests" and "has

authority to fashion a set of limitations that allow as much relevant material to be discovered as

possible...while preventing unnecessary intrusions into legitimate interests that may be harmed by the discovery of material sought". *Schmulovich v. 1161 Rt. 9 LLC*, 2007 U.S. Dist. LEXIS 59705, at *3-4 (D.N.J. 2007); *see also Pearson*, 211 F.3d at 65; Fed. R. Civ. P. 26(c).

The precise boundaries of the Rule 26 relevance standard depend upon the context of each particular action, and the determination of relevance is within the discretion of the District Court. *See Barnes Found. v. Twp. of Lower Merion*, 1996 WL 653114, at *1 (E.D. Pa. 1996). Certainly, "[c]ourts have construed this rule liberally, creating a broad vista for discovery". *Takacs v. Union County*, 2009 WL 3048471, at *1 (D.N.J. 2009)(*citing Tele-Radio Sys. Ltd. v. DeForest Elecs., Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981)). "Review of all relevant evidence provides each party with a fair opportunity to present an effective case at trial". *Jones*, 238 F.R.D. at 163; *see also Caver*, 192 F.R.D. at 159; *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J. 1990). "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation...[and] either party may compel the other to disgorge whatever facts he has in his possession". *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Indeed, "all parties will benefit from broad discovery, as the court, when ruling on class certification, 'will have the necessary data before it to determine if the requirements of Fed. R. Civ. P. 23(a) are met'". *Bell v. Lockheed Martin Corp.*, 270 F.R.D. 186, 192 (D.N.J. 2010) (citing report of special master).

"Whether certain documents are relevant is viewed in light of the allegations of the complaint, not as to evidentiary admissibility". *Hickman*, 329 U.S. at 507; *see also Scouler v. Craig*, 116 F.R.D. 494, 496 (D.N.J. 1987). "The party seeking discovery has the burden of showing that the information sought is relevant to the subject matter of the action and may lead

to admissible evidence".  *Caver*, 192 F.R.D. at 159; *see also Nestle Foods*, 135 F.R.D. at 105.

Oppositely, "the party resisting discovery has the burden of clarifying and explaining its

objections to provide support therefor".  *Tele-Radio*, 92 F.R.D. at 375; *see also Gulf Oil Corp. v.

Schlesinger*, 465 F. Supp. 913, 916-17 (E.D. Pa. 1979); *Robinson v. Magovern*, 83 F.R.D. 79, 85

(E.D. Pa. 1979); *Nestle Foods*, 135 F.R.D. at 104-105.  More specifically, "[t]he party resisting

production of discovery bears the burden of establishing lack of relevancy or undue burden",

"must demonstrate to the Court that the requested documents either do not come within the broad

scope of relevance as defined in FED. R. CIV. P. 26(b)(1) or else that they are of such marginal

relevance that the potential harm occasioned by discovery would outweigh the ordinary

presumption in favor of broad disclosure", and "must do more than argue that to compile and

produce [documents] would be burdensome".  *Guiterrez v. Johnson & Johnson, Inc.*, 2002 U.S.

Dist. LEXIS 15418, at *22-23 (D.N.J. 2002); *see also Flora v. Hamilton*, 81 F.R.D. 576

(M.D.N.C 1978); *Burke v. New York City Police Dep't*, 115 F.R.D. 220, 224 (S.D.N.Y. 1987).

        "[A] discovery request may be denied if, after assessing the needs of the case, the amount

in controversy, the parties' resources, the importance of the issues at stake in the action, and the

importance of the discovery in resolving the issues, the District Court finds that there exists a

likelihood that the resulting benefits would be outweighed by the burden or expenses imposed as

a consequence of the proposed discovery".  *Takacs*, 2009 WL 3048471, at *1; *see also Bayer AG

v. Betachem, Inc*., 173 F.3d 188, 191 (3d Cir. 1999).  "The purpose of this rule of proportionality

is to guard against redundant or disproportionate discovery by giving the court authority to

reduce the amount of discovery that may be directed to matters that are otherwise proper subjects

of inquiry".  *Takacs*, 2009 WL 3048471, at *1(*citing Bowers v. National Collegiate Athletic*

*Assoc.*, 2008 WL 1757929, at *4 (D.N.J. 2008)); *see also Leksi, Inc. v. Federal Ins. Co.*, 129 F.R.D. 99, 105 (D.N.J. 1989); *Public Service Group, Inc. v. Philadelphia Elec. Co.*, 130 F.R.D. 543, 551 (D.N.J. 1990).  "Requiring a responding party to perform extensive research or to compile substantial amounts of data and information does not automatically constitute undue burden" and "[i]mposing such a burden is particularly proper where...the information is crucial to the ultimate determination of a crucial issue and where the location of the documents is best known by the responding party".  *Capacchione v. Charlotte-Mecklenburg Sch.*, 182 F.R.D. 486, 491 (W.D.N.C. 1998).

    **(B)**    **Interrogatories to Parties**

    FED. R. CIV. P. 33 provides:

> (a) In General.
>    . . .
> > (2) Scope.  An interrogatory may relate to any matter that may be inquired into under Rule 26(b).  An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.
> > . . .
> (b) Answers and Objections.
>    . . .
> > (3) Answering Each Interrogatory.  Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath.
> >
> > (4) Objections.  The grounds for objecting to an interrogatory must be stated with specificity.  Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure.

"The more progressive approach to interrogatories dealing with legal matters is to view them in the factual context within which they arise".  *Microtron Corp. v. Minnesota Mining & Mfg. Co.*,

269 F. Supp. 22, 25 (D.N.J. 1967); *see also Singer Manufacturing Co. v. Brother International Co.*, 191 F. Supp. 322 (S.D.N.Y. 1960).  "If the answer might serve some legitimate purpose, either in leading to evidence or in narrowing the issues, and to require it would not unduly burden or prejudice the interrogated party, the court should require answer".  *Id.*; *see also* 4 MOORE'S FEDERAL PRACTICE, 2d Ed. 2534; *Gagen v. Northam Warren Corp.*, 15 F.R.D. 44 (S.D.N.Y. 1953).

The Court notes that "all grounds for objections to interrogatories must be stated with specificity and...any ground not so stated in a timely objection is waived unless excused by the Court for good cause".  *Hall v. Sullivan*, 231 F.R.D. 468, 473 (D. Md. 2005).  Although "[t]here is no similar provision in Rule 34, ...[i]f one looks at the commentary to Rule 34...it is clear that the procedures under Rule 34 were intended to be governed by the same procedures applied under Rule 33".  *Id.*

**(C)     Requests for Production of Documents**

Pursuant to FED. R. CIV. P. 34,

> (a) In General.  A party may serve on any other party a request within the scope of Rule 26(b):
>
> > (1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:
> >
> > > (A) any designated documents or electronically stored information ...  or
> > >
> > > (B) any designated tangible things; ...
>
> (b) Procedure.
> . . .
> (2) Responses and Objections

8

. . .

(B) Responding to Each Item.  For each item or category, the response must either state that inspection and related activities will be permitted as requested or state an objection to the request, including the reasons.

(C) Objections.  An objection to part of a request must specify the part and permit inspection of the rest.

(D) Responding to a Request for Production of Electronically Stored Information.  The response may state an objection to a requested form for producing electronically stored information.  If the responding party objects to a requested form – or if no form was specified in the request – the party must state the form or forms it intends to use.

(E) Producing the Documents or Electronically Stored Information.  Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:

> (i) A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request;

> (ii) If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms; and

> (iii) A party need not produce the same electronically stored information in more than one form.

Pursuant to *Armor Screen Corp. v. Storm Catcher, Inc.*, 2009 WL 291160, at *5, 2009 U.S. Dist. LEXIS 63538, *7-9 (S.D. Fla. 2009), a case cited by both parties, the Court notes

the need to balance Rule 34(b)(2)(E)(i)'s legitimate purpose of alleviating a responding party's burden of production while reasonably assuring a requesting party's ability to obtain discoverable documents under Rule 26(b)(1). Rule 34 is generally designed to facilitate discovery of relevant information by preventing attempts to hide a needle in a haystack by mingling responsive documents with large numbers of nonresponsive documents. A producing party fails to meet its Rule 34 obligations by producing a mass of undifferentiated documents for the responding party to inspect. While Rule 34 does not obligate a producing party to *per se* organize and label usable documents for the requesting party's convenience, a party exercising Rule 34's option to produce records as they are kept in the usual course of business should organize the documents in such a manner that the requesting party may obtain, with reasonable effort, the documents responsive to their requests. ...The standard this Court will use in determining what is required will be whether the production allows the requesting party to reasonably determine what documents are responsive to its requests. If it does, the production complies with Rule 34(b)(2)(E)(I). If it does not, then the production does not comply.

*See also Williams v. Taser Int'l, Inc.*, 2006 WL 1835437, at *7 (N.D. Ga. 2006).

**(D)   Possession, Custody or Control and/or Agency in Rule 34 Context**

"Rule 34(a) provides that a party may serve a request for production of documents that are 'in the possession, custody or control of the party upon whom the request is served'". *Camden Iron & Metal, Inc. v. Marubeni America Corp.*, 138 F.R.D. 438, 441 (D.N.J. 1991); *see also* FED. R. CIV. P. 34. "In the context of FED. R. CIV. P. 34(a), so long as the party has the legal right or ability to obtain the documents from another source upon demand, that party is deemed to have control". *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 160 (3d Cir. 2004). "If the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have 'control'...even if the documents are actually in the possession of a non-party". *Sedona Corp. v. Open Solutions, Inc.*, 249 F.R.D. 19, 22 (D. Conn. 2008); *see also*

*In re Flag Telecomm Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006); *Rosie D. v. Romney*, 256 F. Supp. 2d 115, 119 (D. Mass. 2003).

"An agency relationship may be established by: (1) express authority; (2) implied authority...to do all that is proper, usual and necessary for the authority actually granted; (3) apparent authority, as where the principal holds one out as agent by words or conduct; and (4) agency by estoppel". *Id*. at 161. "It is well settled that apparent authority (1) results from a manifestation by a person that another is his agent and (2) exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized". *Id*.; *see also Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 989 (3d Cir. 1995); RESTATEMENT (SECOND) OF AGENCY § 8, Comment A & C (1958). "There need not be an agreement between parties specifying an agency relationship; rather, the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation". *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 337-38 (N.J. 1993). "Moreover, direct control of principal over agent is not absolutely necessary; a court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent". *Id*. at 338.

"[A] party seeking production of documents bears the burden of establishing the opposing party's control over those documents," where "[c]ontrol is defined as the legal right, authority or ability to obtain documents upon demand". *Camden Iron*, 138 F.R.D. at 441; *see also United States v. International Union of Petroleum & Industrial Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989); *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984). The Court notes that "federal courts construe 'control' very broadly under Rule 34" and "have held that a

litigating parent corporation has control over documents in the physical possession of its subsidiary corporation where the subsidiary is wholly owned or controlled by the parent". *Id.*; *see also Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D. Conn. 1989); *Gerling Int'l Ins. Co. v. Commissioner*, 839 F.2d 131, 140 (3d Cir. 1988). "Conversely, where the litigating corporation is the subsidiary and the parent possesses the records, courts have found control to exist on the following alternate grounds:

> (1) the alter ego doctrine which warranted 'piercing the corporate veil';
> (2) the subsidiary was an agent of the parent in the transaction giving rise to the lawsuit;
> (3) the relationship is such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in litigation;
> (4) there is access to documents when the need arises in the ordinary course of business; and
> (5) subsidiary was marketer and servicer of parent's product (aircraft) in the United States.

*Id.* at 441-42*; see also Gerling*, 839 F.2d at 140-141. "Hence, in parent/subsidiary situations, the determination of control turns upon whether the intracorporate relationship establishes some legal right, authority or ability to obtain the requested documents on demand" and "[e]vidence considered by the courts includes the degree of ownership and control exercised by the parent over the subsidiary, a showing that the two entities operated as one, demonstrated access to documents in the ordinary course of business, and an agency relationship". *Id.* at 442*; see also Gerling*, 839 F.2d at 140-141.

"Moving past the alter ego argument, the inquiry becomes whether control can be established on any of the other grounds for litigating subsidiary/parent situations as outlined in the *Gerling* decision". *Id.* at 443. The Court notes that "[t]he most applicable cases are those

12

holding that a company's ability to demand and have access to documents in the normal course of business gives rise to the presumption that such documents are in the litigating corporation's control". *Id.*; *see also Cooper Industries, Inc. v. British Aerospace*, 102 F.R.D. 918, 919-20 (S.D.N.Y. 1984). "One factor courts have used in making that determination is whether the agent-principal relationship is connected to the issue being litigated". *Hitachi, Ltd. v. AmTRAN Technology Co. Ltd.*, 2006 WL 2038248, at *2 (N.D. Cal. 2006); *see also* 8A Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE, § 2210 (2d ed. 1987). In fact, a "third party's financial interest in...litigation might further require its cooperation in the discovery process". *Id.*; *see also Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992).

### (E)    Class Certification and the NJCFA

"Class certification is proper only if the trial court is satisfied, after  a rigorous analysis, that the prerequisites of Rule 23 are met". *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008). As such, "[a] class certification decision requires a thorough examination of the factual and legal allegations". *Id.*; *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001). "The trial court, well-positioned to decide which facts and legal arguments are most important to each Rule 23 requirement, possesses broad discretion to control proceedings and frame issues for consideration under Rule 23". *Id.* at 310. However, "proper discretion does not soften the rule...[that] a class may not be certified without a finding that each Rule 23 requirement is met." *Id.*; *see also Newton*, 259 F.3d at 162.

The Court notes that "[t]he following principles guide a district court's class certification

analysis".  *Id*. at 316.  "First, the requirements set out in Rule 23 are not mere pleading rules" and "[t]he court may delve beyond the pleadings to determine whether the requirements for class certification are satisfied".  *Id*.  "A party's assurance to the court that it intends or plans to meet the requirements is insufficient" and "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence".  *Id*. at 318-20. The trial court must "consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class".  *Id*. at 230.

Further, "[a]n overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met" and "[b]ecause the decision whether to certify a class requires a thorough examination of the factual and legal allegations..., the court's rigorous analysis may include a preliminary inquiry into the merits" such that "the court may consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take".  *Id*. at 316-18; *see also Newton*, 259 F.3d at 166-69.  Indeed, "a district court errs as a matter of law when it fails to resolve a genuine legal or factual dispute relevant to determining the requirements".  *Id*. at 320.

With respect to the NJCFA, the Court notes that in order to state a NJCFA claim, "a plaintiff must allege...(1) unlawful conduct[,] (2) an ascertainable loss[,] and (3) a causal relationship between the defendants' unlawful conduct and the plaintiffs' ascertainable loss".  *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389 (N.J. 2007); *see also Indian Brand Farms, Inc. v. Novartis Crop Prot., Inc.*, 617 F.3d 207, 219 (3d Cir. 2010).  With respect to the ascertainable loss prong, the Court notes that

"[i]n cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages". *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 (N.J. 2005).  "At the class certification stage, plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class" but, instead, "they need only show that a 'viable method' is available to prove damages on a class-wide basis".  *In re Neurontin Antitrust Litig.*, 2011 WL 286118, at *9 (D.N.J. 2011); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. 2002).  The Court also notes that "evidence of [a] plaintiff's conduct relevant to the causation issue cannot be ignored without comment in a predominance analysis" because "the Supreme Court of New Jersey has held that individual issues regarding [a] plaintiff's behavior may, in certain cases, defeat predominance in a NJCFA class action...despite the uniformity of a defendant's misrepresentations or omissions". *Nafar v. Hollywood Tanning Sys.*, 339 Fed. Appx. 216, 222-23 (3d Cir. 2009).

### III.   PLAINTIFFS' MOTION

#### (A)   <u>Marketing Materials and Related Correspondence [RFP Nos. 11, 19, 20, 22, 34]</u>

Plaintiffs allege that Defendant violated the NJCFA by omitting and misrepresenting material information about its "Points Program".  *See* Pl.'s Br., dkt. entry no. 49-1 at 6-7.  As such, pursuant to *Indian Brand Farms, Inc. v. Novartis Crop Protection Inc.*, 617 F.3d 207, 219 (3d Cir. 2010), Plaintiffs maintain that they must prove that Defendant (1) engaged in unlawful conduct, (2) that Plaintiffs suffered an ascertainable loss, and (3) that there is a causal connection between Defendant's unlawful conduct and Plaintiffs' ascertainable loss.  *Id*.  Pursuant to *Varacallo v. Mass. Mutual Life Ins. Co.*, 332 N.J. Super. 31, 49 (N.J. Super. Ct. App. Div. 2000)

and *Marcus v. BMW of North Am.*, 2010 WL 4853308, at *11-12 (D.N.J. 2010)), Plaintiffs maintain that, for purposes of class certification, they must demonstrate that Defendant's misrepresentations and omissions were sufficiently uniform such that liability may be adjudicated with common proof. *Id*. at 6-7. Plaintiffs argue that the marketing materials (RFP No. 19) and related correspondence with Blue Bay regarding use of those marketing materials and the sale of Points Program memberships (RFP Nos. 11, 20, 22, and 34) that they requested are highly relevant to an evaluation of the suitability of class treatment of their NJCFA claim. *Id*. at 7. More specifically, if Defendant used the same marketing materials throughout the relevant period, Plaintiffs maintain that class treatment may be appropriate; oppositely, if Defendant used a variety of marketing materials throughout the relevant period, class treatment may not be appropriate. *Id*.

In opposition, Defendant contends that Plaintiffs' argument with respect to these RFPs demonstrates a fundamental problem with the proposed class. *See* Def.'s Opp'n Br., dkt. entry no. 55 at 4. That is to say, Blue Bay – not RCI – sold vacation nights to each of the approximately 4,400 members at four (4) different resorts over a period of more than six (6) years. *Id*. Defendant has advised Plaintiffs that any marketing materials related to the Points Exchange Program that Defendant provided to Blue Bay have been produced to the extent they are in Defendant's possession, custody, or control. *Id*. Defendant contends that it made (and continues to make) diligent inquiries for documents maintained by RCI in the United States, as well as documents maintained by its corporate affiliate in Mexico, and has produced more than 6,000 pages of marketing materials. *Id*.

       **1.**       **RFP Nos. 11, 20, 22, 34**

Plaintiffs maintain that in response to its RFP Nos. 11, 20, 22, and 34, requesting communications between "[Defendant] and Blue Bay concerning training for and sales of Points memberships, and/or the purpose and use of [Defendant'] marketing materials", Defendant has only produced one (1) document and one (1) DVD. *See* Pl.'s Br. at 8-9. Defendant failed to produce any "letters discussing how particular [marketing and/or training] materials...[were] to be used", any "[P]ower [P]oint presentations about marketing and sales of the Points Program", or any "memos discussing sales presentations at Blue Bay". *Id*. at 9. Further, despite Defendant's answer to Interrogatory No. 11, "indicating that Blue Bay consistently purchased materials...including $2,132 for a luxury market symposium in 2007", Defendant has not produced any "materials relating to this symposium or transmittals enclosing purchased point of sale materials". *Id*. Nonetheless, Plaintiffs argue, "[t]here can be no doubt that communications...[occurred] between [Defendant] and Blue Bay...[related to] sales and marketing". *Id*. By way of example, Plaintiffs note, Defendant "amended its contract with Blue Bay to create an additional fee...[in order] to offset the possible excessive use of points partners by putative class members" in October 2003. *Id*. Plaintiffs believe that Defendant was concerned because Blue Bay's sales team "was presenting the Points Program...[as a way to] 'use some of your room nights to go back to your club and...the rest...to purchase flight tickets'". *Id*. As a result, Defendant wanted to minimize the fiscal impact of having to purchase airfare for its members and sought to impose an offsetting fee. *Id*. Plaintiffs argue that Defendant "came to know about [Blue Bay's] sales approach in some manner" and, although it is "possible that nothing about the sales approach discussed in [the] May 1, 2008 Memo ever materialized in written form, Plaintiffs find it unlikely that Defendant's knowledge of the content of the sales

17

presentation was gained solely through verbal means". *Id*. Plaintiffs maintain that any "such written communications would be relevant to Court's analysis of whether Plaintiffs' [NJ]CFA claim is suitable for class treatment because they could indicate uniformity in the approach to sales...from which the Court could infer uniformity in the alleged misrepresentations and omissions", thereby "making class certification proper". *Id*. at 9-10.

Plaintiffs contend that Defendant's objections to RFP Nos. 11, 20, 22, and 34, as being beyond the permissible scope of class certification discovery, are without merit. *Id*. at 10. Although Defendant claims that "producing correspondence between it and Blue Bay...and communications concerning the purpose and use of [Defendant's] marketing materials is overly burdensome", Plaintiffs note that Defendant has never justified this assertion. *Id*. Citing *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J. 1990) and *Tele-Radio Systems Ltd. v. De Forest Electronics*, 92 F.R.D. 371, 375 (D.N.J. 1981), Plaintiffs assert that Defendant has failed to demonstrate "how [the] requested information is maintained, a description of the activities which would be necessary to retrieve it, the resources necessary to compile it, the full-time equivalent person hours implicated, or any other concrete information to substantiate its burden". *Id*. Further, citing *ACLU v. Gonzales*, 237 F.R.D. 120, 128 (E.D. Pa. 2006), Plaintiffs maintain that even if these RFPs were vague and ambiguous – a point which Plaintiffs do not concede – "so long as the...[RFPs] are not so vague as to 'defy comprehension'...[Defendant] must respond to them...[because] objections based on vagueness and ambiguity will not stand". *Id*. at 11. Ultimately, Plaintiffs assert that based on the Parties' meet and confer efforts, "[Defendant] understands...exactly what information Plaintiffs seek". *Id*.

In opposition, Defendant objects to RFP No. 11 on grounds that it exceeds the scope of permissible class certification discovery, is overly broad/unduly burdensome, and is neither relevant nor reasonably calculated to lead to discovery of admissible evidence. *See* Def.'s Opp'n Br. at 5. Defendant notes that it agreed to make its correspondence with resorts operating under the name Blue Bay concerning the named Plaintiffs available for inspection and copying. *Id*. However, Defendant maintains that Plaintiffs have failed to articulate why they need or are entitled to "all correspondence that may have been exchanged with Blue Bay...for purposes of class certification". *Id*. Defendant argues that "such a request, without any limitations whatsoever, would be overly broad and unduly burdensome at any stage of litigation". *Id*. Further, Defendant contends that even if "communications between [Defendant] and Blue Bay about sales and marketing occurred, such documents have no bearing on what, if any, marketing documents Blue Bay actually shared with particular purchasers". *Id*. During oral argument, Plaintiffs' counsel agreed to narrow RFP No. 11 to include only "correspondence relating to marketing materials" and, in return, Defendant's counsel agreed to produce all responsive documents. *See* Joint Letter from Counsel dated July 11, 2012 at 2. Accordingly, based upon the agreement and representations of counsel, Plaintiffs' motion with respect to RFP No. 11 is **DENIED** without prejudice.

With respect to RFP No. 20, Defendant objects on grounds that it exceeds the scope of permissible class certification discovery, is overly broad/unduly burdensome, is neither relevant nor reasonably calculated to lead to discovery of admissible evidence, and is vague and ambiguous insofar as "the terms 'Marketing Materials', 'Materials', and 'benefits' are undefined and susceptible to various interpretations". *See* Def.'s Opp'n Br. at 6. Defendant notes that it

19

produced its "Points Procedures Manual" in response to this RFP and RFP No. 34. *Id*.

With respect to RFP No. 22, Defendant objects on grounds that it exceeds the scope of permissible class certification discovery and is vague and ambiguous insofar as "the term 'exemplar' in the context of 'RCI's training and/or instruction materials' is undefined and susceptible to various interpretations...because the terms 'Blue Bay Employees', 'sales agents', 'materials', and 'training sessions' are undefined and susceptible to various interpretations". *Id*. at 7.   Defendant notes that it agreed "to produce training materials relating to the Points Exchange Program that were provided to Blue Bay during the relevant period of time" in an effort to resolve the dispute concerning this request. *Id*.

With respect to RFP No. 34, Defendant objects on grounds that it exceeds the scope of permissible class certification discovery, is neither relevant nor reasonably calculated to lead to discovery of admissible evidence, and is vague and ambiguous "insofar as the term 'marketing materials' is undefined and susceptible to various interpretations". *Id*.   Defendant notes that it produced its Points Procedure Manual and refers Plaintiffs to same in response to this RFP. *Id*. Further, Defendant claims that RFP No. 34 is duplicative of Plaintiffs' RFP No. 20. *Id*.

The Court, having considered the substance of Plaintiffs' RFP Nos. 20, 22 and 34, concludes that the materials sought are relevant to issues pertaining to class certification, including "uniformity." The Court recognizes that although these Requests are, in some instances, duplicative, they are not so vague or ambiguous as to be incomprehensible to Defendant. Accordingly, Plaintiffs' motion is **GRANTED** with respect to RFP Nos 20, 22 and 34 and Defendant is directed to produce the materials requested within twenty-one (21) days.

### 2.     RFP No. 19

With respect to RFP No. 19, Plaintiffs contend that Defendant "agreed to produce copies of all marketing materials...as that term is used in [Defendant's] Affiliate Agreement with Blue Bay". *See* Pl.'s Br. at 7.  Although Defendant produced various directories, Plaintiffs contend this production only included one (1) or two (2) documents that appear to be "appraisal tables". *Id*. at 7-8.  Because these "appraisal tables" are dated 2006 and 2008, Plaintiffs believe "similar tables should exist" for 2002-2005 and 2007.  *Id*. at 8.  In addition, Plaintiffs note that Defendant produced various "Welcome Kits" but has not produced any exemplars of other point of sales materials such as posters, brochures, banners, or "Benefits Brochure[s]".  *Id*.  Thus, while Defendant promotes to its affiliates that "there are 'many point of sales materials' available, hardly any have been produced to Plaintiffs".  *Id*.

Defendant objects to this RFP on grounds that it exceeds the scope of permissible class certification discovery, is overly broad/unduly burdensome, is neither relevant nor reasonably calculated to lead to discovery of admissible evidence, and is vague and ambiguous insofar as "the term 'Marketing Materials' is undefined and susceptible to various interpretations and insofar as the term 'exemplar' in the context of 'Marketing Materials' is undefined and susceptible to various interpretations".  *See* Def.'s Opp'n Br. at 5.  Notwithstanding these objections, Defendant agreed to make marketing materials (as that term is used in affiliation agreements and exhibits thereto) available to Plaintiffs for inspection and copying.  *Id*. Defendant maintains that it has produced 6,000 pages of documents relating to the Points Exchange Program, including "appraisal tables" for 2001-2004 and 2006-2008, and continues to search for additional responsive documents.  *Id*. at 6.  However, Defendant has not produced Spanish versions of Points Rules and benefits brochures for certain years because it does not

have English versions and because it contends that Spanish versions would not have been provided to U.S. customers/class members.  *Id.*

During oral argument and in the Joint Letter from Counsel dated July 11, 2012, Defendant's counsel represented "that responsive marketing materials within [Defendant's] possession have been produced" and that Defendant "will supplement its response in the event additional responsive documents are found".  *See* Joint Letter from Counsel dated July 11, 2012 at 2.  However, Plaintiffs' counsel has indicated that to date, Defendant has failed to update its response to RFP No. 19.  *Id.*  Therefore, to the extent Defendant has not updated its response to RFP No. 19 to indicate that it has currently produced all responsive materials within its possession, custody or control, this aspect of Plaintiffs' motion is **GRANTED** and Defendant is directed to update its response to this RFP within twenty-one (21) days.

    **(B)**    <u>**Damages Materials [RFP Nos. 7, 8, 12, 32, 33, 39, 40; Interrogatory Nos. 1, 6, 8]**</u>

Initially, Plaintiffs note that pursuant to *In re Neurontin Antitrust Litig.*, 2011 WL 286118 (D.N.J. 2011), part of their "class certification burden includes demonstrating one or more methodologies exist for proving damages on a class-wide basis".  *See* Pl.'s Br. at 11.  Although this requirement "is not a strenuous one", Plaintiffs maintain, "it still must be met" and assert that "some of the information bearing on [their] expert's submission is solely within [Defendant's] possession".  *Id.*

In opposition, Defendant asserts that in addition to "acknowledg[ing] their burden of demonstrating that a 'viable method' is available to prove damages on an class wide basis", Plaintiffs have "concede[d] that they cannot meet this burden because their experts lack sufficient information...[to] determine which, if any, of several methodologies may be

appropriate".   *See* Def.'s Opp'n Br. at 8.   Ultimately, Defendant maintains that "[n]one of [P]laintiffs' requests is relevant...[for purposes of] class certification".   *Id.*

### 1.      Interrogatory Nos. 1 and 6

With respect to Interrogatory Nos. 1 and 6, Plaintiffs asked Defendant to state "the total number of nights putative class members purchased and the total equivalent point value of those nights, and to set forth those totals by year".   *See* Pl.'s Br. at 11.   Plaintiffs maintain that their "expert could use this information to subtract the total points redeemed prior to imposition of the cap from the total points purchased to obtain the total number of outstanding points".   *Id.* at 11-12.   Citing *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 (N.J. 2005), Plaintiffs assert that "[m]ultiplying the outstanding points by the monetary value assigned a point is one means of measuring the aggregate loss in value sustained by the class" and is, therefore, "relevant to meeting their class certification burden".   *Id.* at 12.   Plaintiffs note that despite its failure to originally raise such objections, after counsel engaged in a meet and confer session Defendant "claimed that the information...[requested] was not within its possession, custody or control" and, therefore, that it "had no obligation to respond".   *Id.* at 16.   Notwithstanding this representation, Plaintiffs contend that they "have reason to question [Defendant's] unverified assertion" based upon a "May 1, 2008 Memo...[in which] [Defendant] projected a liability of $3.5 million if the '380 million points already in member's account [sic]' were 'all used towards points partners'...and a potential liability of $9 million if members traded 'their remaining nights towards points'".   *Id.*   Plaintiffs argue that "[t]he only way [Defendant] could project liability for nights not yet exchanged into its system is if it knew how many outstanding nights existed".   *Id.*   Further, "[e]ven if [Defendant] does not itself know the total number of nights putative class

members purchased and the collective equivalent point value of those nights", Plantiffs argue that Defendant "still must provide the information because it is in 'control' of the information for purposes of Rule 34".  *Id*. at 16-17.

Defendant objects to Interrogatory No. 1 on grounds that it exceeds the scope of permissible class certification discovery, is unduly burdensome, is vague and ambiguous insofar as "the phrase 'purchasing nights at a Blue Bay Resort' and the terms 'nights purchased'...and...'equivalent RCI points' are undefined and susceptible to various interpretations", and insofar as this interrogatory "incorrectly assumes that an individual becomes a member of the RCI Points program by 'purchasing nights at a Blue Bay Resort'".  *See* Def.'s Opp'n at 8.  Notwithstanding these objections, Defendant answered this interrogatory by referring Plaintiffs to "Participation Agreements and transaction histories of the named [P]laintiffs" which were previously produced.  *Id*. Defendant also stated that "there are 4,416 RCI Points Members who own or owned" at one or more of several resorts listed "during the period of 2002 through 2008".  *Id*.

Similarly, Defendant objects to Interrogatory No. 6  on grounds that it exceeds the scope of permissible class certification discovery.  *Id*. at 9.  Notwithstanding this objection, Defendant answered this interrogatory by stating that "consistent with section 4 of the Terms and Conditions of RCI Points Subscribing Membership, the number of points assigned to a 'Blue Bay night' ranges from 2,340 to 10,500 points per night depending on the particular unit at issue".  *Id*.  With respect to both Interrogatory Nos. 1 and 6, Defendant claims that it "has provided the information available" and that "it does not have and therefore cannot provide information relating to the total number of nights [P]laintiffs may have purchased from Blue

24

Bay". *Id*. Finally, Defendant notes that "inasmuch as [P]laintiffs purchased their nights from Blue Bay, ...[P]laintiffs failed to explain why the requested information is not already in their possession or why they cannot obtain that information directly from Blue Bay". *Id*.

Having considered the Plaintiffs' Interrogatories Nos. 1 and 6 as well as Defendant's answers thereto, the Court concludes the information sought is relevant to the issues that Plaintiffs must address at the class certification stage and, therefore, Plaintiffs' motion to compel more specific responses to these interrogatories is **GRANTED** and Defendants shall provide such responses within twenty-one (21) days.

### 2.      Interrogatory No. 8

With respect to Interrogatory No. 8, Plaintiffs asked Defendant to state "whether it had ever equated one or more points with a monetary value, and if so, to state each monetary value and to explain the context in which it was utilized". *See* Pl.'s Br. at 12. Despite the fact that Defendant "acknowledged that it has given points the character of currency...by...allowing members to 'rent' points for a fee", Plaintiffs argue that Defendant "declined to tell Plaintiffs what exchange ratio it adopted in this rental example and failed to identify any other circumstance where points and dollars were equated in some fashion". *Id*. For example, Plaintiffs note that "RCI's Points Procedures Manual advises...[that customers should] '[c]onsult...[their] Account Executive to find out the corresponding prices" and, separately, maintain that Defendant "failed to identify that it permits Blue Bay to purchase 'bonus points' to be used as purchase incentives in the sale of nights and Points Program memberships". *Id*. Plaintiffs argue that the fact that "there is no static equation of an RCI Point with a specific dollar amount...makes a thorough response...even more essential". *Id*. at 12-13.   Citing

*Capacchione v. Charlotte-Mecklenburg Schools*, 182 F.R.D. 486, 491 (W.D.N.C. 1988), Plaintiffs maintain that "[t]he mere fact that [Defendant] may have to review seven years of information...is insufficient to establish an undue burden because [Defendant] has not...demonstrated that the rates it charged putative class members to 'rent' points or the amount it charged Blue Bay to purchase 'bonus points' changed so frequently over the course of seven years that it would be too taxing to compile that information in response to Plaintiffs' interrogatory". *Id*. at 17-18.

Defendant objects to Interrogatory No. 8 on grounds that it exceeds the scope of permissible class certification discovery, is unduly burdensome, is vague and ambiguous insofar as "the term 'equated' is undefined and susceptible to various interpretations". *See* Def.'s Opp'n at 9. Notwithstanding these objections, Defendant answered this interrogatory by stating that "although it permits Members to 'rent' RCI Points in accordance with its Terms and Conditions, there is no static equation of an RCI Point with a specific dollar amount". *Id*. Defendant notes that Plaintiffs are not satisfied with its response and "have demanded every instance in which [Defendant] has placed a monetary value on an RCI Point...[based on the contention that] such information must be considered in crafting a damage model". *Id*. at 10. However, Defendant argues that Plaintiffs have failed "to explain why they need such information to craft a model...and...fail to provide any guidance on what specific information would satisfy their expert". *Id*. Further, Defendant maintains that despite admitting that their expert "will explore his own evaluation of the monetary value of a point" with or without the additional information they seek, Plaintiffs "do not explain what their expert might do with...[additional information]" and concede that same "may be of only tangential assistance to their expert". *Id*.

Having considered the Plaintiffs' Interrogatory No. 8, as well as Defendant's answers thereto, the Court concludes the information sought is relevant to the issues that Plaintiffs must address at the class certification stage and, therefore, Plaintiffs' motion to compel more specific responses to these interrogatories is **GRANTED** and Defendants shall provide such responses within twenty-one (21) days.

### 3.    RFP No. 7

With respect to RFP No. 7, Plaintiffs asked Defendant to produce "all documents that [Defendant] relied upon in its decision to impose an annual 60,000 point limitation [on] redemptions for Partner Inventory". *See* Pl.'s Br. at 15.  Defendant objects to this RFP on grounds that it exceeds the scope of permissible class certification discovery, is neither relevant nor reasonably calculated to lead to discovery of admissible evidence, seeks documents protected from disclosure by the attorney-client privilege and/or work product doctrine, and is vague and ambiguous insofar as "the terms 'relied' and 'interests' are undefined and susceptible to various interpretations". *See* Def.'s Opp'n at 12-13.  Although Defendant "does not dispute that it imposed a cap or that the cap applied to the putative class", Defendant maintains that Plaintiffs have failed to "explain why documents relating to [Defendant's] decision to impose the cap, as opposed to the implementation of the cap, will impact any damages methodology". *Id.*

### 4.    RFP No. 8

With respect to RFP No. 8, Plaintiffs asked Defendant to produce "all documents that reflect why [Defendant] decided to impose an annual 60,000 point limit on redemptions for Partner Inventory". *See* Pl.'s Br. at 13.  Defendant objects to this RFP for the same reasons set

forth with respect to RFP No. 7.  *See* Def.'s Opp'n at 12-13.  Again, although Defendant "does not dispute that it imposed a cap or that the cap applied to the putative class", Defendant maintains that Plaintiffs have failed to "explain why documents relating to [Defendant's] decision to impose the cap, as opposed to the implementation of the cap, will impact any damages methodology".  *Id.*

### 5.    RFP Nos. 12 and 32

With respect to RFP Nos. 12 and 32, Plaintiffs asked Defendant to produce "any notes, emails, memoranda, reports, meeting minutes and the like concerning the decision to impose the cap".  *See* Pl.'s Br. at 13.  Despite acknowledging that some materials encompassed in these RFPs may be of only tangential assistance to their expert's evaluation of the monetary value of a point while others may be crucial, Plaintiffs cite *Bell v. Lockheed Martin Corp.*, 270 F.R.D. 186, 191 (D.N.J. 2010), *aff'd*, 2010 WL 3724271 (D.N.J. 2010) for the proposition that "broader rather than narrower discovery better serves the parties and ultimately...the Court...in resolving the class certification decision".  *Id.*  Although Defendant "admits that 'it has entered into agreements with third-party vendors concerning the provision of airline tickets to Points members'", Plaintiffs note that Defendant "has only produced one such agreement...[in which] it redacted all of the pricing information related to those travel services".  *Id.*  Plaintiffs maintain that because this information is relevant to their presentation of damages at the class certification stage, "it should be produced in full and without redactions".  *Id.*  Further, citing *Roesberg v. Johns-Manville Corp.*, 85 F.R.D. 292, 300-302 (E.D. Pa. 1980), Plaintiffs contend that they "used common words in their ordinary meaning", that "their requests are clear on their face...and...in the context of this case", and that "it is difficult to fathom how [they] could have

used different words that would have been clearer". *Id*. at 15-16.

Defendant objects to RFP No. 12 on grounds that it exceeds the scope of permissible class certification discovery, is neither relevant nor reasonably calculated to lead to discovery of admissible evidence, seeks documents protected from disclosure by the attorney-client privilege and/or work product doctrine, and is vague and ambiguous insofar as "the terms 'internal RCI notes', 'meeting agenda', 'documentation', and 'annual cap' are undefined and susceptible to various interpretations". *See* Def.'s Opp'n at 12.  Defendant objects to RFP No. 32 on substantially similar grounds. *Id*. at 13.  Again, although Defendant "does not dispute that it imposed a cap or that the cap applied to the putative class", Defendant maintains that Plaintiffs have failed to "explain why documents relating to [Defendant's] decision to impose the cap, as opposed to the implementation of the cap, will impact any damages methodology".  *Id*. Notwithstanding these objections, Defendant agreed to "produce documents reflecting [its] implementation of a 60,000 Points limit on Points Partner transactions".  *Id*.

The Court, having considered the substance of Plaintiffs' RFP Nos. 7, 8, 12 and 32 agrees with Defendant that, inasmuch as Defendant does not dispute that the 60,000 point limit was implemented, the information requested is not relevant to the issues related to class certification. Accordingly, Plaintiffs' Motion is **DENIED**.


### 6.    RFP No. 39

With respect to RFP No. 39, Plaintiffs asked Defendant to produce "all itemized records of all costs and expenses that [Defendant] attributes to the Blue Bay Resorts' affiliation with [Defendant] with respect to its Points Program".  *See* Pl.'s Br. at 14.  Plaintiffs contend that they

29

"could use data in [Defendant's] possession to model...lost cost savings attributable to [Defendant's] conduct". *Id*. Further, Plaintiffs assert that "it would be helpful for...[their] expert to know information about the out-of-pocket expenses [Defendant] incurred to purchase airfare prior to the cap because that amount could be a proxy for the amounts class members must now shoulder". *Id*.

Defendant objects to this RFP on grounds that it exceeds the scope of permissible class certification discovery, is neither relevant nor reasonably calculated to lead to discovery of admissible evidence, and is vague and ambiguous insofar as "the phrase 'the Blue Bay Resorts' affiliation with [Defendant]' is undefined and susceptible to various interpretations". *See* Def.'s Opp'n at 10-11. Defendant maintains that "the burden of identifying and collecting each record that may reflect costs or expenses relating to Blue Bay is obvious" and Plaintiffs "have not identified any basis for why such information is necessary for class certification". *Id*. at 11.

### 7.     RFP No. 40

With respect to RFP No. 40, Plaintiffs asked Defendant to produce "profit and loss statements to the extent those statements relate to [Defendant's] affiliation with Blue Bay". *See* Pl.'s Br. at 17. Despite Defendant's contention that "it did not maintain profit and loss statements at such a finite level", Plaintiffs maintain that "[t]his unverified assertion is difficult to square with a comment made by [Defendant's] Senior Vice President and Chief Operating Officer...during efforts to negotiate a change in the memberships Blue Bay was selling and to impose the 60,000 point cap", "suggest[ing] that [Defendant's] affiliation with Blue Bay, particularly with respect to the Points program, is traceable in its profit and loss statements". *Id*. Again, Plaintiffs contend that they "could use data in [Defendant's] possession to model...lost

cost savings attributable to [Defendant's] conduct". *Id.* Further, Plaintiffs assert that "it would be helpful for...[their] expert to know information about the out-of-pocket expenses [Defendant] incurred to purchase airfare prior to the cap because that amount could be a proxy for the amounts class members must now shoulder". *Id.*

Defendant objects to this RFP on grounds that it exceeds the scope of permissible class certification discovery, is neither relevant nor reasonably calculated to lead to discovery of admissible evidence, and is vague and ambiguous insofar as "the phrase 'the Blue Bay Resorts' affiliation with [Defendant]' is undefined and susceptible to various interpretations". *See* Def.'s Opp'n at 10-11. Again, Defendant maintains that "the burden of identifying and collecting each record that may reflect costs or expenses relating to Blue Bay is obvious" and Plaintiffs "have not identified any basis for why such information is necessary for class certification". *Id.* at 11. Nonetheless, Defendant has advised Plaintiffs that "it does not maintain profit and loss statements specific to Blue Bay...and [Defendant] has no obligation to create them". *Id.*

### 8.     RFP No. 33

With respect to RFP No. 33, Plaintiffs asked Defendant to produce "one copy of each agreement concerning airlines miles and/or airline tickets in any way related to the RCI Points Program". *See* Pl.'s Br. at 15. Plaintiffs maintain that "[t]o the extent that [Defendant] paid for airfare is a factor in Plaintiffs' expert's damages analysis, it is essential to know if those payments were controlled by contractual...rather than market...rates". *Id.* Although Defendant "admits that 'it has entered into agreements with third-party vendors concerning the provision of airline tickets to Points members'", Plaintiffs note that Defendant "has only produced one such agreement...[in which] it redacted all of the pricing information related to those travel services".

*Id*.  Plaintiffs maintains that because this information is relevant to their presentation of damages at the class certification stage, "it should be produced in full and without redactions".  *Id*.

Defendant objects to this RFP on grounds that it exceeds the scope of permissible class certification discovery, is neither relevant nor reasonably calculated to lead to discovery of admissible evidence, and is vague and ambiguous insofar as "the terms 'airline miles' and 'airline tickets' are undefined and susceptible to various interpretations".  *See* Def.'s Opp'n at 11.  Defendant states that it "has entered into agreements with third-party vendors concerning the provision of airline tickets to Points Members" and agreed to "produce copies of agreements with Trilegiant Corporation that were in place from October 2005 to June 2011".  *Id*.  Despite the fact that Defendant "has produced the relevant agreement", Defendant maintains that Plaintiffs "complain that confidential pricing information is necessary to devise a damages methodology" while ignoring "the distinction between a methodology and a calculation" and failing "to explain why specific pricing information is relevant to [P]laintiffs' ability to demonstrate a viable damages methodology".  *Id*.

The Court, having considered the substance of Plaintiffs' RFP Nos. and 39, 40 and 33, concludes that the informatoin and material sought are not relevant to the issues pertaining to class certification, including Plaintiffs' damages methodology. Accordingly, Plaintiffs' Motion is **DENIED.**

### (C)    Blue Bay Materials [Interrogatory Nos. 1 & 6]

Initially, Plaintiffs note that Defendant did not originally object to any request based on lack of possession, custody or control.  *See* Pl.'s Br. at 18.  Rather, with respect to RCI Mexico, Defendant represented that it was obtaining responsive information and that delays were

attributable to these efforts in addition to translating documents.  *Id.*  However, to date, Defendant has not produced any document that has been translated as a result of this litigation. *Id.*  Pursuant to *Hall v. Sullivan*, 231 F.R.D. 468, 473-74 (D. Md. 2005), Plaintiffs argue that Defendant's failure to timely assert an objection based on lack of possession, custody or control in its initial or supplemental responses to Interrogatory Nos. 1 and 6 constitutes a waiver.  *Id.*  Even if Defendant has not waived this objection, Plaintiffs cite *Camden Iron and Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441 (D.N.J. 1991) for the proposition that Defendant should be compelled to obtain the requested information from Blue Bay because Defendant has control over same.  *Id.* at 19.  Noting that they seek very specific information related to the number of nights that class members bought annually and the aggregate point value of those nights, Plaintiffs cite *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 160 (3d Cir. 2004), *Sedona Corp. v. Open Solutions, Inc.*, 249 F.R.D. 19, 22 (D. Conn. 2008), and *Rosie D. v. Romney*, 256 F. Supp. 2d 115, 119 (D. Mass. 2003) and argue that the Affiliate Agreement between Defendant and Blue Bay grants Defendant a contractual right to obtain precisely this information and puts Defendant in control of the information for purposes of responding to discovery requests.  *Id.*

Plaintiffs also contend that pursuant to *Rosie D.*, 256 F. Supp. 2d at 119, Defendant may be compelled to obtain the requested information because Blue Bay is Defendant's agent.  *Id.* at 20.  Citing *Sears Mort. Corp. v. Rose*, 134 N.J. 326, 337 (N.J. 1993), Plaintiffs maintain that the Court should consider the circumstances related to the relationship between Defendant and Blue Bay, arguing that an agency relationship exists when one party consents to have another party act on its behalf with the principal directing and controlling the acts of the agent and that it is the

33

conduct of the principal and agent that cements the relationship, not their intent or the words they might set forth in a contract.  *Id*.  Here, Defendant contractually authorized Blue Bay to act on its behalf in selling Points Program memberships and carefully controlled the manner in which Blue Bay could sell those memberships.  *Id*.  The Affiliation Agreements between Defendant and Blue Bay require Blue Bay to provide prospective members with specific materials furnished by Defendant, authorize Blue Bay to sign Participation Agreements on Defendant's behalf, and authorize Blue Bay to collect new member enrollment fees on Defendant's behalf.  *Id*.  Citing *Hitachi, Ltd. v. AmTRAN Tech. Co. Ltd.*, 2006 WL 2038248, at *2-3 (N.D. Cal. 2006), Plaintiffs contend that Defendant's Procedures Manual demonstrates how Defendant authorized Blue Bay to act on its behalf, controlled how it did so, and was deeply involved in nearly every aspect of Blue Bay's sales (not just Points Program sales).  *Id*. at 21. For example, Plaintiffs note that the Procedures Manual dictates specifics for what Blue Bay must include in presentations, requires Blue Bay to undertake extensive reporting with respect to sales, directs that Points Participation Agreements must be completed properly, directs the steps that Blue Bay must undertake if class members want to purchase additional points, and sets forth how Blue Bay could acquire bonus points to offer in the sales process.  *Id*.  Alternatively, citing *In re Glenz v. Sharp Elec. Corp.*, 2010 WL 2758729, at *4 (D.N.J. 2010), Plaintiffs request the opportunity to conduct specific discovery on the issue of control if the Court remains unpersuaded that Defendant is in possession, custody or control of the requested information.  *Id*. at 21-22.

        In opposition, Defendant argues that Plaintiffs ignore the fact that the transactions at issue did not involve Defendant and that Plaintiffs entered into separate "Membership

Subscription Contracts" directly with Blue Bay. *See* Def.'s Opp'n Br. at 13. Thus, it is Plaintiffs – rather than Defendant – who have access to the requested information. *Id*. Plaintiffs offer no reason why they cannot obtain the requested information from class members or directly from Blue Bay. *Id*. at 14. Notwithstanding these facts, Defendant maintains that Plaintiffs' position that it can be compelled to obtain the requested information lacks legal and logical support given that a party cannot be obligated to produce that which it does not have simply because it fails to articulate an objection that the requested materials are not in its "possession, custody or control" pursuant to FED. R. CIV. P. 34. *Id*. at 13-14.

Defendant further maintains that the cases cited by Plaintiffs do not support their position that a court can compel a party to produce documents or information within the possession of a non-party entity simply because the party has a contractual right to inspect certain records. *Id*. at 14-15. Specifically, Defendant argues, *Mercy Catholic* was premised on a finding that the entities at issue were interchangeable under applicable Medicare and Medicaid rules and principles of agency whereas here, Plaintiffs cannot establish that Blue Bay was Defendant's agent. *Id*. at 15. Further, Defendant argues, *Sedona Corp*. was based on a finding that the defendant had an exclusive right to materials created by its contract partner during or as a result of the development of the product at issue and had the ability to obtain these materials upon request whereas here, Defendant is not a party to any contract with Blue Bay. *Id*. Likewise, according to Defendant, *Rosie D*. was based on a finding of a contractual right to control and obtain the documents at issue whereas here, even RCI Mexico does not have control over the documents at issue. *Id*. Rather, the information requested is contained within contracts between Plaintiffs and Blue Bay and Plaintiffs have failed to explain why they cannot access this

information or why it is remotely relevant to issues of class certification. *Id*.

Finally, Defendant asserts, Plaintiffs cannot establish that Blue Bay is Defendant's agent as any determination of agency would require a factual record that does not exist and likely would be based on the laws of Mexico, rather than New Jersey. *Id*. Even if the Court were to conclude that it has a basis to compel Defendant to instruct RCI Mexico to make a contractual request for information from Blue Bay, Defendant maintains that the Court would have no ability to compel production of that information because it does not have jurisdiction over Blue Bay or RCI Mexico. *Id*. at 15-16

Here, the Court believes Plaintiffs have articulated a sufficient showing to support an agency relationship between Defendant and Blue Bay. Therefore, having considered the Plaintiffs' Interrogatories Nos. 1 and 6 as well as Defendant's answers thereto, the Court concludes the information sought is relevant to the issues that Plaintiffs must address at the class certification stage and, therefore, Plaintiffs' motion to compel with respect to these interrogatories is **GRANTED** and Defendants shall provide such responses within twenty-one (21) days.

    (D)    <u>Other Materials [RFP Nos. 5, 29, 30, 31, 37; Interrogatory Nos. 2, 7, 9, 10]</u>

        1.    **RFP No. 29**

With respect to RFP No. 29, Plaintiffs contend that Defendant must produce information related to document retention policies because same may assist Plaintiffs in narrowing and specifying future discovery requests in addition to assisting in disputes over what information is in Defendant's possession, custody or control. *See* Pl.'s Br. at 25. In opposition, Defendant maintains that its document retention policies have no bearing on Plaintiffs' motion for class

certification and, further, argues that Plaintiffs' assertion that production of this information may assist in narrowing and specifying future discovery requests is insufficient.  *See* Def.'s Opp'n Br. at 17.

Having reviewed Plaintiffs' RFP No. 29 and Defendant's response thereto, and noting that FED. R. CIV. P. 26(b)(1) has been construed liberally to create a "broad vista for discovery" (*Takacs*, 2009 WL 3048471, at *1), the Court finds the information requested in RFP 29 relevant and reasonably calculated to lead to the discovery of admissible evidence (FED. R. CIV. P. 26(b)(1); *see also Pearson*, 211 F.3d at 65).  For the reasons previously set forth on the record and above, this aspect of Plaintiffs' motion is **GRANTED** and Defendant is directed to produce its document retention policy within twenty-one (21) days.

### 2.    RFP No. 30

With respect to RFP No. 30, Plaintiffs contend that Defendant must produce a copy of each "organizational chart reflecting employees of [Defendant] for the years 2006 through 2010".  *See* Pl.'s Br. at 24.  Plaintiffs maintain that this information is relevant and will assist in their "understanding...[of] which persons...[at] what level...[and] at which entities...[were] corresponding with one another in the documents [Defendant] has produced" and will aid Plaintiffs "in identifying who might need to be deposed in connection with Plaintiffs' motion for class certification and/or who might have additional discoverable files containing information pertaining to Plaintiffs' class certification motion".  *Id*.  Plaintiffs have agreed to limit their request to organizational charts for RCI Mexico and RCI NA.  *Id*.  Despite the fact that Plaintiffs have "conceded that an organization chart for RCI Mexico is not relevant to class certification", to the extent that they exist, Defendant has agreed to provide organizational charts for RCI

Mexico for the years 2006 through 2010.  *See* Def.'s Opp'n Br. at 16.  To date, however, Defendant represents that "no such charts have been identified".  *Id.*  With respect to RCI NA, during oral argument Defendant's counsel acknowledged Plaintiffs' position and agreed to engage in a meet and confer session with Plaintiffs' counsel in order to narrow Plaintiffs' request to a departmental focus, and, thereafter, agreed to produce departmentally-focused organizational charts for the years 2006 through 2008.

Based upon these representations and as set forth on the record, this aspect of Plaintiffs' motion was **GRANTED** and Defendant was directed to produce the organizational charts. Subsequently, Plaintiffs' counsel advised the Court that Defendant has "provided lists of management and executive leadership employees for the years 2006 through 2008" and represented that this "resolv[es]" outstanding issues related to RFP No. 30.  *See* Joint Letter from Counsel dated July 11, 2012 at 1.

### 3.      RFP Nos. 5, 31, and 37

With respect to RFP Nos. 5, 31, and 37, Plaintiffs contend that Defendant must produce transaction history data – including contact information for all putative class members, the effective date of each putative class member's RCI membership, and the cancellation date for each putative class member – in native format or an agreed alternative rather than in PDF format because, pursuant to FED. R. CIV. P. 34(b)(2)(E)(ii) and *Ford Motor Co. v. Edgewood Prop. Inc.*, 257 F.R.D. 418, 425 (D.N.J. 2009), the PDF format is unusable.  *See* Pl.'s Br. at 22-24; *see also* Joint Letter from Counsel dated May 14, 2012 at 2.  Although Defendant previously indicated that it would produce an "electronic spreadsheet", Plaintiffs contend that PDF format is not a spreadsheet and causes a substantial burden and expense for Plaintiffs given that it will require

retyping more than 16,000 lines of data. *Id.* Plaintiffs argue that Defendant must be compelled to produce this information in a tab-delimited format such as Excel and that Defendant's contention that it did not prepare or maintain the requested information in such a manner in the ordinary course of its business is legally irrelevant because, pursuant to *Ford Motor*, 257 F.R.D. at 425, *Aguilar v. Immigration and Customs Enforc. Div. of US Dep't Homeland Sec.*, 255 F.R.D. 350 (S.D.N.Y. 2008), and FED. R. CIV. P. 34 (b)(2)(E)(ii), the appropriate inquiry is whether the production is in a reasonably usable form rather than whether it had taken that form in the ordinary course of business. *Id.* In addition, Plaintiffs argue that Defendant should be required to add a field to its new production – "company". *Id.*

In opposition, Defendant initially stated that "the requested data does not exist in the ordinary course of business and was created, at [P]laintiffs' request, as a courtesy to facilitate discovery". *See* Def.'s Opp'n Br. at 16. However, Defendant subsequently agreed to produce a "spreadsheet reflecting transaction histories in an electronic format upon [P]laintiffs' agreement that the production shall not constitute an admission that such information is relevant or a waiver of any privilege that may relate to [Defendant's] preparation of the spreadsheet". *Id.* at 16; *see also* Joint Letter from Counsel dated May 14, 2012 at 2.

During oral argument, Defendant's counsel acknowledged Plaintiffs' position and agreed to provide the requested data "in a usable format". In response, Plaintiffs' counsel agreed to **WITHDRAW** this aspect of its motion without prejudice. Plaintiffs' counsel has indicated that Defendant has "provided...putative class member data in a usable electronic format" and has represented that this "resolv[es]" outstanding issues related to RFP Nos. 5, 31, and 37. *See* Joint Letter from Counsel dated July 11, 2012 at 1, 3. Accordingly, based on these representations of

39

counsel, this aspect of Plaintiffs' motion is deemed **MOOT**.

###### 4.    Interrogatory Nos. 2 and 7

With respect to Interrogatory Nos. 2 and 7, Plaintiffs maintain that, in both instances, Defendant refused to provide summary data about putative class members' transactions beyond 2008, the year Defendant imposed the annual cap.  *See* Pl.'s Br. at 26.  Plaintiffs argue that what, if anything, putative class members did with their points after the cap was imposed remains a relevant inquiry.  *Id.*  Specifically, Plaintiffs contend that this information is relevant to their "expert's damages analysis to the extent he needs to factor in any value received for points after the cap (such as using points for a traditional timeshare exchange)".  *Id.*  In opposition, Defendant simply argues that its answers are sufficient and that Plaintiffs have "failed to offer any explanation as to why additional information...is relevant to class certification".  *See* Def.'s Opp'n Br. at 17.

Having reviewed Plaintiffs' Interrogatory Nos. 2 and 7 and Defendant's answers thereto, and noting that FED. R. CIV. P. 26(b)(1) has been construed liberally to create a "broad vista for discovery" (*Takacs*, 2009 WL 3048471, at *1), the Court finds the information requested in Interrogatory Nos. 2 and 7 is relevant and/or reasonably calculated to lead to the discovery of admissible evidence (FED. R. CIV. P. 26(b)(1); *see also Pearson*, 211 F.3d at 65), and finds Defendant's answers insufficient.   Accordingly, this aspect of Plaintiffs' motion was **GRANTED**.  Defendant's counsel has indicated that "data for 2002 through 2008...has [already] been provided" and "has agreed to provide data for the years 2009 and 2010".  *See* Joint Letter from Counsel dated July 11, 2012 at 2.  Based upon this representation, and for the reasons previously set forth on the record and above, Defendant is directed to provide supplemental

answers that include the summary data requested about putative class members' transactions for the period 2009 through 2010 within twenty-one (21) days.

### 5.    Interrogatory No. 9

With respect to Interrogatory No. 9, although Defendant "generically" identified three (3) individuals, Plaintiffs contend that Defendant's answer is insufficient given that they asked for the identity of each person "who was involved in the decision to impose a 60,000 cap, ...who provided analytical support for the decision, ...who was in charge of any communications to putative class members concerning the decision, and...who provided any financial analyses". *See* Pl.'s Br. at 25.  Plaintiffs maintain that without a more fulsome response, they have no way to determine who was actually involved in the decision-making process with respect to the imposition of the cap.  *Id.*  Further, Plaintiffs argue that pursuant to *Capacchione v. Charlotte-Mecklenburg Schools*, 182 F.R.D. 486, 490-91 (W.D.N.C. 1988), Defendant "may not simply point to a pile of documents in response to an interrogatory".  *Id.*  In opposition, Defendant maintains that it has "already...identified the individuals who were directly included in the process of initiating the cap...at issue in this case".  *See* Def.'s Opp'n Br. at 16.  Defendant notes that it will not "identify every person who may have had any involvement in that decision" because this information "is not relevant to class certification and would impose an undue burden on [Defendant]".  *Id.*  However, Defendant "has agreed to supplement its response to specifically identify 'members of the Deal Pricing Council' (or at least to specifically identify a document listing the same)" although it "will not...identify all persons who provided any analytical support for the decision".  *See* Joint Letter from Counsel dated May 14, 2012 at 3.

During oral argument, Defendant's counsel acknowledged Plaintiffs' position and

41

"agreed to supplement its response...to identify the individuals who made the decision to impose the cap and individuals who performed a substantive analytical function in assisting those who made the decision". *See* Joint Letter from Counsel dated July 11, 2012 at 2. Based upon this representation, and for the reasons previously set forth on the record and above, this aspect of Plaintiffs' motion is **DENIED** without prejudice. However, Defendant is directed to provide the supplemental information set forth above within twenty-one (21) days.

### 6.        Interrogatory No. 10

With respect to Interrogatory No. 10, Plaintiffs note that they requested a specific description of the information considered in connection with Defendant's decision to impose the 60,000 point redemption annual cap and to identify the location and/or source of the information. *See* Pl.'s Br. at 25-26. Plaintiffs maintain that Defendant did not provide an adequate answer, failing to state with particularity both the location and/or source of the information provided. *Id*. In opposition, Defendant contends that its answer is proper and that Plaintiffs have failed to identify any reason or basis why Defendant should be compelled to provide the location and/or source of the information beyond what Defendant has already provided. *See* Def.'s Opp'n Br. at 17.

Having reviewed Plaintiffs' Interrogatory No. 10 and Defendant's answer thereto, and noting that FED. R. CIV. P. 26(b)(1) permits parties to obtain discovery "including the existence, description, nature, custody, condition, and location of...documents" and has been construed liberally to create a "broad vista for discovery" (*Takacs*, 2009 WL 3048471, at *1), the Court finds the information requested in Interrogatory No. 10 is relevant and/or reasonably calculated to lead to the discovery of admissible evidence (FED. R. CIV. P. 26(b)(1); *see also Pearson*, 211

42

F.3d at 65), and finds Defendant's answer insufficient.  For the reasons previously set forth on the record and above, this aspect of Plaintiffs' motion is **GRANTED** and Defendant is directed to provide a supplemental answer specifically identifying the data and documents that were considered and/or relied upon in Defendant's decision to impose the annual cap within twenty-one (21) days.

## IV.    DEFENDANT'S MOTION

The Court notes that in response to Defendant's motion to compel, "[P]laintiffs produced amended privilege logs for Plaintiffs Michael Siembida and Angeline Davis and withdrew any assertion of privilege that had been asserted on behalf of Kenneth Marek".  *See* Joint Letter from Counsel dated May 14, 2012 at 1.  "Plaintiffs also produced documents corresponding to entries on their initial privilege logs that had been removed...with the exception of counsel's engagement letters with [P]laintiffs, which [P]laintiffs...are [now] withholding based on their contention that engagement letters are not relevant".  *Id.*  As such, what remains of Defendant's motion are two (2) issues: "(1) the adequacy of [P]laintiffs' amended privilege logs" and "(2) [P]laintiffs' failure to produce engagement letters".  *Id.*

### (A)    <u>Amended Privilege Logs</u>

Defendant concedes that Plaintiffs' amended privilege logs address several of the deficiencies that Defendant identified in Plaintiffs' original logs.  *Id.* at 2.  However, Defendant maintains that two (2) primary deficiencies remain.  *Id.*

First, Defendant argues that entries referring to "handwritten notices to attorney redacted" are insufficient because they fail to identify the author or recipient of the notes and fail to identify the date of the notes as opposed to the date of the underlying document.  *Id.*  Plaintiffs

43

agreed to address this deficiency and produced "revised privilege logs on June 15, 2012".  *See* Joint Letter from Counsel dated July 11, 2012 at 1.  Based upon this production, Defendant's counsel has represented that "all remaining issues...have been resolved" and that this aspect of its motion to compel has been **WITHDRAWN**.  *Id*. at 2.

Second, Defendant argues that entries "regarding communications between Ryan Johnson, Esq. ("Johnson") and Clayton Voegtle, Esq. ("Voegtle") on one hand, and third parties or individual [P]laintiffs on the other hand, are insufficient because [P]laintiffs have not demonstrated [that] the underlying communications...[are] attorney-client communication[s] or work-product, that [P]laintiffs have standing to assert a privilege, or that any privilege has not been waived".  *See* Joint Letter from Counsel dated May 14, 2012 at 2.

During oral argument, Plaintiffs' counsel acknowledged Defendant's position, agreed to contact Mssrs. Johnson and Voegtle to determine whether they had in fact asserted any privilege related to the subject communications, and agreed to produce Certifications from Mssrs. Johnson and Voegtle regarding their assertion of any privilege.  Plaintiffs' counsel also conceded that the subject communications would be produced if Mssrs. Johnson and Voegtle could not be located or had not asserted any privilege. Plaintiffs agreed to address this deficiency and, subsequently, produced "a declaration from...[Mr.] Voegtle concerning work product and/or privilege protections".  *See* Joint Letter from Counsel dated July 11, 2012 at 1.  Based upon this production and the representations of Plaintiffs' counsel, Defendant's counsel has advised that "all remaining issues...have been resolved" and that this aspect of its motion to compel has been **WITHDRAWN**.  *Id*. at 2.

     **(B)**    <u>**Engagement Letters**</u>

As stated above, Plaintiffs have withdrawn their assertion of privilege as to engagement letters between counsel and the proposed class representatives.  *See* Joint Letter from Counsel dated May 14, 2012 at 2.  However, Plaintiffs have not produced these engagement letters and have refused to testify about them because they maintain that the engagement letters are not relevant for purposes of class certification.  *Id*.; *see also* Def.'s Br., dkt. entry no. 50-1 at 4-5.

Defendant argues that Plaintiffs waived any relevance objection when they included the engagement letters on their original privilege logs.  *Id*.; *see also* Def.'s Br. at 6.  Further, Defendant contends that the engagement letters are relevant to the issue(s) of whether Plaintiffs are adequate class representatives and whether Plaintiffs' counsel is adequate class counsel.  *Id*.; *see also* Def.'s Br. at 5.  Defendant notes that certain Plaintiffs "signed an agreement when they joined the RCI Points Exchange Program...which requires those Plaintiffs to pay RCI's attorney fees incurred in defending an action brought by such plaintiff if RCI prevails in the lawsuit" and, in fact, "Plaintiff Kenneth Marek testified about an understanding with his attorneys with regard to indemnification for this potential liability".  *See* Def.'s Br. at 5.  Citing *Ferraro v. General Motors Corp.*, 105 F.R.D. 429, 433 n.3 (D.N.J. 1984), *In re Semel*, 411 F.2d 195, 197 (3d Cir. 1969), and *Montgomery County v. Microvote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999), and maintaining that "fee agreements...are generally not privileged", Defendant argues that it is "entitled to review [P]laintiffs' engagement letters to determine the specific terms of the arrangement" and assess the adequacy concerns set forth above.  *Id*.  Notwithstanding their withdrawal of the assertion of privilege, Plaintiffs disagree with Defendant's position regarding the relevance of the engagement letters and continue to object to their production.  *See* Joint Letter from Counsel dated May 14, 2012 at 2.

Here, the Court notes that Plaintiffs no longer assert any privilege with respect to the engagement letters.  Given the fact that FED. R. CIV. P. 26(b)(1) has been construed liberally to create a "broad vista for discovery" (*Takacs*, 2009 WL 3048471, at *1), the Court finds that Defendant has articulated a sufficient factual basis to support the relevance of the requested engagement letters given that "relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence" (FED. R. CIV. P. 26(b)(1); *see also Pearson*, 211 F.3d at 65).  For the reasons previously set forth on the record and above, this aspect of Defendant's motion was **GRANTED** and Plaintiffs were directed to produce the engagement letters.  Plaintiffs' counsel has indicated that it "produced retainer agreements...as directed" and Defendant's counsel has represented that "all remaining issues...have been resolved".  *See* Joint Letter from Counsel dated July 11, 2012 at 1-2. Accordingly, this issue is **MOOT**.

## V.      CONCLUSION & ORDER

For the reasons previously set forth on the record as well as those set forth above,

**IT IS** on this 28th day of March, 2013,

**ORDERED** that Plaintiffs' Motion to Compel is **GRANTED**, in part, and **DENIED**, in part, as set forth above; and it is further

**ORDERED** that Defendant's Motion to Compel is **GRANTED**, in part, and **DENIED**, in part, as set forth above; and it is further

**ORDERED** that Counsel are directed to meet and confer, as required by L. Civ. R. 26.1(d)(3), concerning the current status of discovery and to submit a joint status report to the Court no later than April 30, 2013.

A live status conference will be conducted on May 14, 2013 at 3:30 PM in Courtroom 6W.

s/ *Douglas E. Arpert*
**DOUGLAS E. ARPERT**
**UNITED STATES MAGISTRATE JUDGE**

**DATED: March 28, 2013**

47