UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KENNETH A. BARTON, et al.,

    Plaintiff,

v.

RCI, LLC.

    Defendant.

Civil Action No. 10-3657 (PGS) (DEA)

**MEMORANDUM**

    This matter comes before the Court on Plaintiff's Motion for Class Certification pursuant to Fed. R. Civ. P. 23(a) and (b)(3) (ECF No. 67).

    Defendant RCI, LLC ("RCI") is primarily engaged in the business of vacation exchanges. RCI offers its members both week-for-week vacation exchanges and customized vacation experiences through two exchange networks, the Weeks Program and the Points Program. The named Plaintiffs and putative class members are current or former members of RCI's Points Program.

    The Points Program is a "global points-based vacation exchange system" that differs from a traditional timeshare model. In a traditional timeshare model, an owner of a timeshare deposits a timeshare interval into a pool of inventory and exchange it for a different timeshare interval of comparable value (vacation exchange). ln the RCI Points Program, a member's timeshare interval has a point value, and when the timeshare interval is deposited with RCI, the member may apply the point value toward a variety of services including airline tickets, car rentals, cruises or, in lieu of points, the usual vacation exchange. For example, the class

1

representatives sought to use points they had acquired under the Points Program to obtain airline tickets at a discounted price to accommodate their travel needs.

From 2002 to 2008, the Blue Bay Resorts ("Blue Bay") located near Cancun, Mexico, were a chain of resorts affiliated with RCI. The "Blue Bay Family of Resorts" include (1) the Blue Bay Club, a family-oriented resort; (2) the Temptation Resort and Spa, an adults-only, clothing-optional resort; (3) the Desire Resort and Spa, Cancun, an adults-only, clothing-optional and adult-themed resort; and (4) the Desire Resort and Spa, Los Cabos, an adults-only, clothing optional and adult-themed resort. Whereas the Blue Bay Club is marketed as a family resort, promotional materials for the Desire resorts offer adult-oriented vacations featuring "swingers," "sexy games" and "lingerie models." At each location, Blue Bay personnel sold intervals commonly referred to as a "period of nights" through programs called the Blue Bay Premier Vacation Program and the RCI Points Membership Program. Each person who bought "a period of nights" was also given the option to seek membership in the "Points Program". All of the named Plaintiffs entered into contracts through the Blue Bay Premium Vacation Club program and the RCI Points Program. A one night stay at Blue Bay could be exchanged through RCI for a number of points. An individual could purchase a package of one night stays at a Blue Bay Resort for a one-time cost. A Points Program member could exchange those nights with RCI. In turn, RCI would assign a number of points which the member could then use to either customize future vacations or acquire other services (such as airfare, car rental or cruises) through RCI's Points Program. Members were entitled to access RCI's Points system to obtain such services. For example, each member of the Points Program could allocate their vacation time to RCI, and, in return, receive comparable time at different affiliated resorts around the world. The class representatives contend that membership in the Points Program did not impose any limitation on

the number of nights that could be exchanged for points and also that the points acquired could be accelerated.

In September 2008, RCI came to the realization that it was losing money on the Blue Bay Points Program. As a result, RCI communicated with each Points Program member who had joined through Blue Bay prior to February 29, 2008 to notify them that RCI was imposing a 60,000 annual point limit cap on the Points Program Inventory Exchange (the "Cap"). This meant that a 60,000 annual point limit Cap was being imposed on exchanges for cruises, airline tickets and car rentals. The Cap, however, did not include exchanges for vacation time at another affiliated resort. A 60,000 annual point Cap essentially equates to the redemption value for one domestic one-way airline flight per year.

The class representatives now allege that the imposition of the Cap constituted a breach of contract, a breach of the covenant of good faith and fair dealing, and a violation of the New Jersey Consumer Fraud Act and the New Jersey Plain Language Act[1]. Plaintiff's counsel argues that all individuals who are members of the Blue Bay Premiere Vacation Club and the RCI Points Program were similarly injured. As such, the proposed class is defined as:

> All persons residing in the United States who entered into a Participation Agreement with RCI at a Blue Bay resort prior to February 29, 2008, who had more than 60,000 points as of September 1, 2008, and who have not entered into a release.

Each of the named class representatives alleges common facts related to their dispute with RCI. All of their experiences are factually similar, with a few minor differences. The facts common to each class representative, which are established in Plaintiff Barton's certification, are summarized below. The unique characteristics of the other class representatives are also discussed.

---

[1] There was little discussion about the Plain Language Act in the motion papers.

According to Barton's declaration,[2] in December 2002, he vacationed at a Blue Bay resort. He was given the opportunity to obtain free services at the hotel spa if he attended a timeshare presentation hosted by Blue Bay. At the timeshare presentation he met with an unidentified gentleman employed by Blue Bay.  The gentleman explained the history of the resort, RCI's interest in forming an alliance with Blue Bay and the availability of a unique membership opportunity. Most notably, the gentleman detailed how RCI exchanged services through the RCI Points Program.  The gentlemen stated that instead of using nights to stay at the resort, "a member of the Blue Bay Premier Vacation Club had the flexibility to use the nights as points in RCI's exchange system."  The gentleman further explained that a member was entitled to accelerate the use of points, meaning that a member could use all of the available points at one time, if desired. The gentleman recounted anecdotes of members and sales agents using points to obtain airline tickets for their friends and family. The gentleman also compared differently priced packages of nights that could be converted to points to acquire airfare at a fixed 45,000 point-per-domestic-ticket rate, plus the transaction fee, versus buying airfare on the open market.  Barton immediately recognized the financial advantage of using points for airfare rather than purchasing airfare on the open market. As such, Barton agreed to join both programs.

Barton assumed that the gentleman had the authority to represent RCI.  Once he agreed to make a purchase, Barton met with a woman who was described as a "legal representative." She and Barton reviewed the two contracts that he was required to sign. The first contract was to become a member of a Blue Bay Premier Vacation Club from which he purchased his interval of nights.  The second contract was a Participation Agreement for the Points Program offered by

---

[2] The declaration signed by Barton is confusing because it opens as "I, Kenneth Marek, declare". Despite same, the Court relies on the signature.

RCI. Barton believed that the legal representative had the authority to act on behalf of RCI, so he signed both[3]. According to Barton, he made an initial purchase of nights from Blue Bay and then four supplemental purchases in December 2003, January 2005, March 2006 and September 2007. Barton indicated that he paid Blue Bay a total $51,701.83 for those purchases. He then exchanged the nights for points for an RCI assigned value of 2,832 points per night, acquiring a total of 15,001,104 RCI points. Since Barton already owned property in Cancun, the Blue Bay Premier Vacation Club Agreement held no value to him. The ability to obtain roundtrip airfare at a discount by exchanging points was the only reason he entered the agreements. In the Fall of 2008, RCI imposed the Cap which left Barton feeling "deceived and shocked."

Plaintiff Angeline Davis's description of her negotiations at Blue Bay mirrors that of Plaintiff Barton. Davis purchased a period of nights for $24,500 which she then converted to 2,832,000 points. Half of the amount paid came from transferring out of an "old" Blue Bay timeshare into the Blue Bay Premiums Vacation Club membership. Less than six weeks after Davis signed the agreements, and before she had the opportunity to exchange any points, RCI imposed the Cap. At that time (February 2008), an RCI representative advised Davis that she must contact Blue Bay because the Points Program had changed, and there was a Cap on certain redemptions from the Points Program. Davis felt similarly deceived and shocked, as the Cap essentially eliminated her ability to obtain roundtrip airfare and use any of her points.

Plaintiff William S. Fishman's experience resembles that of Barton and Davis except that Fishman verified the facts presented by the gentleman during the presentation by calling an RCI representative. Wary of falling victim to a scam, Fishman called RCI from the marketing

---

[3] Although Barton signed both agreements, it is not certain whether any representative of RCI signed any of them. Despite same, RCI does not dispute that all Plaintiffs became members of the programs.

presentation. The RCI vacation guide confirmed that Fishman could exchange $30,000.00 worth of nights for points and redeem them for multiple airline tickets. Since Fishman recognized the financial advantage of using points for airfare over purchasing airfare on the open market, he purchased $30,000 of nights from Blue Bay and later converted the nights to 8,496,000 points. The following year, an RCI representative advised Fishman that RCI had imposed a Cap on the redemption of certain Point Program services. Fishman was similarly shocked.

      Plaintiff Justin C. Lyon's declaration reiterated similar allegations regarding the RCI programs. According to Lyon, during his presentation, the gentleman compared differently priced packages of points to use for airfare at a fixed point-per-domestic-ticket rate, plus the transaction fee, versus buying airfare on the open market. Recognizing the financial advantage, Lyon purchased $33,900.00 of nights from Blue Bay with the ability to convert them to 8,496,000 points. Lyon was provided with a booklet containing tables that listed the services provided within the Points Program and the associated points range necessary to obtain the services. The booklet showed options such as international airfare. Unlike the other named Plaintiffs, Lyon recalled that the female "legal representative" wore an RCI badge. Lyon was provided with a folder that contained copies of both agreements and instructions on how to exchange the nights for points. He made at least one purchase of airfare at a discounted price. Thereafter, during the summer of 2008, he learned that RCI imposed the Cap.

      While Kenneth Marek had a similar experience at the timeshare presentation, his use of points differed from that of the other named Plaintiffs. Marek purchased nights from Blue Bay at a cost of $24,530.00. His intent was to convert the nights to 5,600,000 points. In the summer of 2008, however Marek called RCI to obtain a roundtrip airline ticket to Tokyo. He was advised

that there was a Cap on redemption of certain Point Program services and the flight to Tokyo exceeded the Cap.

Unlike the other Plaintiffs, RCI claims that Marek breached the Points Program agreement by selling the airline tickets to third parties for a profit. According to RCI, the resale of tickets violated Section 18(i) of the Points Partner Agreement which imposed "limitations" on members' use of points.

Stevan McCarthy states a similar story. Recognizing the financial advantage, McCarthy purchased nights from Blue Bay for $25,935.00 with the ability to exchange them for 5,600,000 points.

Joseph Semifero's experience is the same except he met with a "woman" rather than a "gentleman" at the timeshare presentation. The woman allegedly showed Semifero a framed letter from another member (Barton) extolling the Program. Semifero purchased a package of nights for $10,000 from Blue Bay with the ability to convert them to 1,401,840 points. In the fall of 2008 when Semifero received the letter from RCI advising him of the Cap, he complained to the company. An RCI representative then offered to extend a higher cap to Semifero for an abbreviated period of time if he signed a form releasing any potential claims against the company.

Michael Siembida had a similar experience as the other Plaintiffs. Siembida initially purchased 2,070 nights from Blue Bay for $26,000.00. Thereafter, he made three supplemental purchases for a total of 5,933 nights for a price of $66,800.00 which he intended to convert to 22,664,496 points. Toward the end of 2007, a Blue Bay employee advised Siembida that Blue Bay and RCI were feuding, and that Blue Bay was reviewing whether to terminate its

relationship with RCI. At some point, Siembida was offered the opportunity by Blue Bay to convert his membership to an alternate program.

A summary of the nights purchased by class representatives and the points to assign upon exchange is set forth in the chart below.

<u>Summary of Nights and Points</u>

|  | Cost of Nights | Points |
|---|---|---|
| Barton | $51,701.83 | 15,001,104 |
| Davis | $24,500.00[4] | 2,832,000 |
| Fishman | $30,000.00 | 8,496,000 |
| Lyons | $33,900.00 | 8,496,000 |
| Marek[5] | $24,530.00 | 5,600,000 |
| McCarthy | $28,000.00 | 5,600,000 |
| Semifero | $10,000.00 | 1,201,840 |
| Siembida[6] | $60,400.00 | 16,802,256 |

In addition to the allegations made by the class representatives, Plaintiffs' class counsel relies on the testimony of Chris Oldroyd, a former Blue Bay Premier Vacation Cub sales representative who served from early 2006 until early 2009. Oldroyd contends that he and other sales agents were trained to market the memberships in a consistent and uniform manner. Each salesperson was regularly tested on the delivery and content of the sales presentation. In

---

[4] Half of Davis's payment was by a credit for her transferring out of an old Blue Bay Timeshare into the Blue Bay Premium Vacation Club.
[5] Marek does not adequately represent the class because he is only person where there is a unique defense in that he was selling airline tickets obtained from redemption of points on a commercial basis.
[6] Siembida made four purchases totaling the amounts above.

delivering the presentation, Oldroyd relied on RCI's materials, such as points exchange tables, directories of resorts, and exemplar member contracts. Within his presentation, he explained the opportunity to purchase nights at Blue Bay, and the ability to exchange those nights for points which could be redeemed in RCI's Point Program for airfare and other services. More specifically, Oldroyd explained how points could be accelerated. He explains that, ordinarily, membership in the Blue Bay Premier Vacation Club was for a 25 year term, and a member had the right to exchange all of the nights for points at once, thereby accelerating all of the points immediately. Oldroyd indicated that there was no cap on how many points could be exchanged at any given time. Consistent with RCI's written materials, he presented the Points Program as flexible, allowing members to freely convert nights to points. In Oldroyd's opinion, the most attractive feature of the two agreements was the ability to use points to obtain discounted airfare, and most prospective customers focused on that feature of the agreements. He explained to numerous prospective members the comparison between their average annual airfare expenditures against the expense of purchasing nights with the ability to exchange them to points to obtain airfare. During Oldroyd's sales presentation, he would demonstrate the financial benefits of program membership to prospective members. For example, a prospective member who purchased $14,000 to $17,000 of nights, would receive the equivalent of 2.8 million points. With these points, one could obtain 62 roundtrip flights through RCI's Points Program (assuming a 45,000 point per ticket valuation). When comparing that amount ($14,000 - $17,000) with the actual cost of airline tickets which had an average cost of $500 per ticket, the total amount would be approximately $31,000. According to Oldroyd, RCI materials, including a brochure on the Points Program and a directory of affiliated resorts, were provided during each presentation. Based on his attendance at RCI events and functions, visitation of RCI's call center and frequent

conversations with RCI employees, Olroyd believed that RCI was aware of the sales presentations and the contend contained therein.

Alan G. Goedde, Expert

In addition, Plaintiffs' counsel also relies on the expertise of Dr. Alan Goedde, an economist familiar with the hospitality industry. Dr. Goedde evaluated whether an appropriate economic methodology exists to quantify the economic harm on a class-wide basis.  He found that the best method to assess damages involved looking at the value of the points both before and after the imposition of the Cap.  He stated that:

> The appropriate methodology for calculating damages in this case is one that determines the amount of money needed as of the date of the change in terms of the contract to put Plaintiffs in as good a financial condition as they were in prior to the imposition of the cap. A financial model can provide a determination of the value to class members of the lost ability to utilize their points due to the cap on Points Partner Inventory exchanges. The model will be constructed from actual data available from RCI, Blue Bay and the members of the Plaintiff Class. (Goedde Decl. at ¶ 13).

In short, Dr. Goedde used what he called a "before and after" approach to determine damages.  He noted that "the before and after approach is a commonly used damages methodology that compares the activity of the plaintiffs before the onset of the wrongdoing with the activity of the plaintiffs after the onset of the wrongdoing."  (Goedde Decl. at ¶ 21). He further indicated that the "before and after" approach is often utilized in other areas, such as antitrust cases. As such, Dr. Goedde found "the appropriate methodology compares the pre-Cap level of activity to the level of activity following the imposition of the Cap." (Goedde Decl. at ¶ 23).  Dr. Goedde determined:

> The amount of Plaintiffs' damage is the value of the difference between the activity levels while taking into account other factors. For example, the recession in the US (December 2007- June 2009) would not have materially affected Plaintiff decision-making

during the pre-cap period because the Plaintiffs' vacations are pre-paid using points to exchange for airline tickets, hotel rooms and other services. The before and after approach is a particularly well-suited approach in this case because the RCI database of transactions by class members contains Points Partner Inventory exchanges from 2002 to September 2008 (before the imposition of the cap in September 2008) as well as Points Partner Inventory exchanges after imposition of the cap. (Goedde Decl. at ¶ 23).

In order to determine the loss to Plaintiffs resulting from imposition of the Cap, Dr. Goedde looked at the trends in point usage from 2002 through 2008. Dr. Goedde found that in 2008, 86 percent of all point redemptions were for airfare and the other 14 percent were for other services. The results of Dr. Goedde's approach are evidenced in RCI's Points Program chart in the Points Program which reads as follows:

**Points Program Chart**

| Exchange this many RCI Points . . . | for this discount amount[7] | Price Per Point[8] (approximate) |
|---|---|---|
| 12,500 | $100 | .0080 |
| 20,000 | $150 | .0075 |
| 25,000 | $200 | .0080 |
| 35,000 | $300 | .0086 |
| 45,000 | $400 | .0089 |
| 55,000 | $500 | .0091 |
| 70,000 | $600 | .0086 |
| 90,000 | $800 | .0089 |

---

[7] The ratios represent the ability to convert RCI Points to discounts for airfare, hotel stays and other Points Partner benefits subject to transaction fees. In addition, as explained in the 2008 summary, the discount program was introduced in 2008 and was not available during most of the class period, and the discount program and the amount of the discounts were subject to same (and have changed) since 2008.

[8] This column was added by the Court.

11

| | | |
|---|---|---|
| 115,000 | $1,000 | .0087 |
| 145,000 | $1,250 | .0086 |
| 170,000 | $1,500 | .0088 |
| 200,000 | $1,750 | .0088 |

In short, Dr. Goedde claims that all 3,523 class members are similarly situated. That is, the Point Program agreement was breached by the Cap because it significantly altered "the ability to exchange an unlimited amount of points for airfare immediately and in the future."

On the other hand, RCI presents some facts which counter Plaintiff's theory. For example, RCI submits the affidavit of Claire Mahoney, its Chief Financial Officer. In her affidavit, Mahoney demonstrates that certain members of Blue Bay involved in the Points Program have redeemed their points differently from the class representatives, or not at all. Maloney provides the following examples:

   a. 1,195 of the 3,523 Blue Bay Members never conducted any transactions with RCI;

   b. Of the 2,328 Blue Bay Members that did transact with RCI, 439 did not use any Points from the Points Program;

   c. Of the 1,889 Blue Bay Members that transacted with RCI and exchanged Points for Points Program, 333 never used more than 60,000 Points for Points Partner benefits in any year prior to the cap;

   d. William T. [Line 281] used a total of 880,180 Points with RCI between 2005 and 2008, but did not use any Points for Points Partner benefits;

   e. David H. [Line 508] used a total of 832,700 Points with RCI between 2004 and 2013, but did not use any Points for Points Partner benefits;

   f. Steven P. [Line 186] used a total of 782,500 Points with RCI between 2005 and 2013, but did not use any Points for Points Partner benefits;

   g. Carlos G. [Line 388] used a total of 757,600 Points with RCI between 2003 and 2010, but did not use any Points for Points Partner benefits;
   h. Mark M. [Line 3153] used a total of 541,340 Points with RCI between 2007 and 2013, but did not use any Points for Points Partner benefits;

12

    i. Anton B. [Line 980] used a total of 523,760 Points with RCI between 2005 and 2012, but did not use any Points for Points Partner benefits;

    j. Michael M. [Line 1877] used a total of 472,480 Points with RCI between 2006 and 2013, but did not use any Points for Points Partner benefits;

    k. Lauri D. [Line 684] used a total of 414,880 Points with RCI between 2004 and 2011, but did not use any Points for Points Partner benefits;

    l. Keith M. [Line 335] used a total of 348,980 Points with RCI between 2003 and 2010, but did not use any Points for Points Partner benefits;

    m. Brent O. [Line 804] used a total of 328,000 Points with RCI between 2004 and 2012, but did not use any Points for Points Partner benefits;

    n. Charles N. [Line 15] used a total of 311,760 Points with RCI between 2003 and 2008, but did not use any Points for Points Partner benefits;

    o. Scott C. [Line 469] used a total of 206,600 Points with RCI account between 2004 and 2011, but did not use any Points for Points Partner benefits;

    p. D/B [Line 602] used a total of 1,575,980 Points with RCI between 2004 and 2010, and used a total of 34,500 Points for Points Partner benefits;

    q. Marie F. [Line 1755] used a total of 1,285,210 Points with RCI account between 2006 and 2011, and used a total of 50,000 Points for Points Partner benefits;

    r. James M. [Line 2838] used a total of 1,006,580 Points with RCI between 2007 and 2013, and used a total of 55,000 Points for Points Partner benefits;

    s. Jonas F. [Line 304] used a total of 549,740 Points with RCI between 2003 and 2012, and used a total of 25,000 Points for Points Partner benefits;

    t. Teodoro S. [Line 541] used a total of 424,020 Points with RCI between 2004 and 2013, and used a total of 55,000 Points for Points Partner benefits;

    u. Robin H. [Line 1150] used a total of 343,500 Points with RCI between 2005 and 2012, and used a total of 10,000 Points for Points Partner benefits.

Mahoney concludes that some members acted irreconcilably different than the class representatives. To further demonstrate the differences between the named plaintiffs and the proposed class members, RCI relies on the testimony of its hospitality industry expert, Alan

Tantleff. He illustrates that putative class members may chose different options. For example, Mr. Tantleff found that many members could have participated in the Points Program for various reasons other than acquiring airfare, such as:

    a.     to utilize the nights to stay at one of the Blue Bay resorts;

    b.     To use the nights in exchange for other RCI affiliated resorts (i.e. on the Exchange Network);

    c.     To share the nights with friends or family to use at either Blue Bay or other Exchange Network Properties.

    d.     to use the nights through a combination of some, or all of the above.

As a result, Tantleff opined that there is no uniform method, as Dr. Goedde assumes, to determine that each member was damaged as a result of the Cap. Indeed, he suggests that some members may be fully satisfied with the remaining options outlined above.

### III.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. at 1432 (citing *Califano v. Yamasaki*, 442 U.S. 682, 700-701, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979)). In order to meet the requirements of this exception, a party moving to represent a class "must affirmatively demonstrate his compliance with Rule 23." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. at 2551-2552. The Third Circuit has emphasized that "actual, not presumed, conformance with Rule 23 requirements is essential." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Id.*

A party seeking class certification bears the burden of proving that the proposed class

action satisfies the requirements of Fed. R. Civ. P. 23. *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183-84 (3d Cir. 2001). To meet this burden, Plaintiff must satisfy the four prerequisites of Rule 23(a) and show that the action can be maintained under at least one of the three subsections of Rule 23(b). In the Third Circuit, we look beyond the pleadings at the class certification stage of litigation. "[I]n reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001). Class certification is proper only after a "rigorous analysis" that all prerequisites of Federal Rule 23 are met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)).

Generally, the Court may certify when the Court finds the question of law or fact common to class members predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The twin requirements . . . are known as predominance or superiority. *In Re Hydrogen Peroxide Antitrust Lit.*, 552 F.3d at 311 (quoting in part Fed. R. Civ. P. 23(b)(3).

Predominance "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *In Re Hydrogen Peroxide Antitrust Lit.*, 552 F.3d at 311 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 623 (1997)). "Clearly, if proof of the essential elements of the cause of action require individual treatment, then there cannot be a predominance of 'questions of law and fact common to the members of the class.'" *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 156 (3d Cir. 2002) (quoting Fed. R. Civ. P. 23(b)(3)). The plaintiff's task is to show that the essential elements of the cause of action are capable of

proof through evidence that is common to the class, rather than evidence unique to each individual class member. Thus, the Court looks for common proof. *In Re Hydrogen Peroxide Antitrust Lit.*, 552 F.3d at 311-12. Where common proof is not available, separate mini-trials may be required, and courts have found that the "staggering problems of logistics thus created" make the case unmanageable as a class action. *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir.1977).

RCI presents two arguments for denying class certification. First, it claims that there is no uniform marketing presentation, and hence, each class member must prove his or her specific experience. Second, RCI asserts that the experiences of potential class members differed since some members did not undertake any Point Program activities and others redeemed their points for services other than airfare. The Court assesses both arguments below.

First, RCI claims that there was no standard marketing presentation, and therefore, each class member must prove these facts on an individual basis. For example, RCI alleges that (a) Oldroyd changed his affidavit to state that Blue Bay, as opposed to RCI, formulated the presentation; (b) Plaintiffs did not specifically identify the "gentleman" who delivered the sales presentation, nor the woman "legal representative;" (c) Blue Bay has four different resorts in Cancun, and separate timeshare presentations occurred at each; (d) since Blue Bay is not a defendant, there is insufficient information to determine what level of control Blue Bay exercised over the presentations; and (e) there are provisions within the contract between RCI and Blue Bay (RCI Resort Affiliation Agreement) which bolster RCI's position. As such, RCI concludes that "the differences in time (7 years), place (4 resorts), amount (purchases from $2,200 to $75,000) and nights purchased (25 to 7,563) require individual fact finding."

In the Court's view, the Defendant's argument that a lack of a uniform marketing presentation requires individual fact finding lacks merit. Here, the class representatives presented similar facts describing the market presentations and and all agree as to the unilateral imposition of the Cap by RCI in 2008. Despite Mr. Oldroyd's deletion in his affidavit, his deposition and declaration show that the sales presentation did not change considerably during the class period. The facts are sufficiently similar to show a *prima facie* claim of breach of contract and consumer fraud.

Defendant's second argument posits that the experiences of the class representatives sufficiently differ from those of the putative class members to preclude class certification. To the Court, the rigorous analysis applied to class certification motions shows the above issue predominates over common issues. For instance, Mahoney states that about 1,200 out of 3,523 members have never transacted any points with RCI, and another 439 may have transacted with RCI, but they did not utilize the Points Program. Finally there are another 333 who transacted with RCI for airfare but used less than 60,000 points per year. How does one know what Point Program option these members will take? If such members are satisfied with other options available to them, what is the economic harm?[9] As Dr. Tantleff found, this large group of the putative class may be satisfied with the Points Program. Hence, certain putative class members could be satisfied with redeeming the points for a stay at another resort facility, or to simply continue to visit Blue Bay. This argument has merit, and it requires knowledge of each class members' subjective expectations.

---

[9] Although not argued by any party, if a class member is satisfied with the redemption options after the cap, there may be no concrete injury giving rise to the constitutional requirement to brining suit. *Koronthaly v. L'Oreal USA, Inc.*, 374 Fed. Appx. 257 (3d Cir. 2010). It raises an issue which must be addressed when there are 1,200 class members who have <u>not</u> conducted any business with RCI.

In this case, Plaintiffs bring an action for a violation of New Jersey Consumer Fraud Act (N.J.S.A. 56:12-1 et seq.). Pursuant to that statute, each Plaintiff must establish an "ascertainable loss" as a result of unlawful conduct. See *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372 (2007); *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234 (2005). Where there are 1,200 class members who have not conducted any business with RCI, it is difficult to conclude that each suffered an "ascertainable loss" under the RCI Points Program after imposition of the Cap. Such individual information is a subjective inquiry to be conducted through individual fact finding. Hence, the common questions of law and fact do not predominate over any question affecting individual members use of the Points Program. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 259 F.3d 154 (3d Cir. 2001). Obviously, those RCI members who are interested in the adult oriented resorts of Blue Bay may have substantially different priorities from those seeking discounted airfare. The Court concludes that an examination of the individual facts must be conducted on at least half of the class members identified by Ms. Mahoney. Such a result is too convoluted to allow class representation under such circumstances. In addition, Mahoney's affidavit undermines Dr. Goedde's opinion. Dr. Goedde indicated his calculation would encompass all class members. This is an untenable assumption when at least 1,200 of the putative class members never participated in an RCI Points Program transaction. There is no way to assume the points identified by Dr. Goedde are relevant to damages when taking the non-participants into account. Accordingly, the Motion for Class Certification is denied.

Date: March 31, 2014          *s/Peter G. Sheridan*
                              PETER G. SHERIDAN, U.S.D.J.